SIXTH DIVISION
AUGUST 4, 2006

1-02-1244

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 19684 (02) |
| | ) | |
| EDWARD MITCHELL, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TULLY delivered the opinion of the court:

Following a jury trial, defendant, Edward Mitchell, was found guilty of first degree murder and sentenced to 100 years in prison. On appeal, defendant argues (1) that his confession should have been suppressed because it was obtained through coercion; (2) that the surveillance video from the food store where the shooting occurred should not have been admitted as the State failed to lay a proper foundation; (3) that the court improperly allowed hearsay testimony from an expert witness and that defendant's counsel was ineffective for failing to object to the testimony; (4) that he was improperly sentenced to an extended term of imprisonment; and (5) that section 111-3(c)(5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c)(5)(West 2002)), which provides the procedural requirements for seeking an extended-term sentence, violates article I, section 7, of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 7).

The trial court conducted a lengthy hearing on defendant's motion to suppress his confession. The defendant's contention in the trial court was that mistreatment by the police

caused him to make an involuntary confession. Defendant makes that same argument on appeal.

Defendant also argues that his confession should have been suppressed because it was obtained in violation of his fourth amendment rights under the *McLaughlin/Gerstein* rule. See County of Riverside v. McLaughlin, 500 U.S. 44, 114 L.Ed 2d 47, 111 S. Ct. 1661 (1991); Gerstein v. Pugh, 420 U.S. 103, 43 L. Ed 2d 54, 95 S. Ct. 854 (1975). Our discussion of the facts incorporates the testimony from the hearing on the defendant's motion to suppress as well as testimony from the trial.

## FACTS

On July 31, 1999, eight-year-old Paulette Peake was shot and killed while standing inside Pat's Food Store on the corner of 79th Street and Sangamon in Chicago.

Officer Ronald Spraggins of the Chicago police department responded to a call on July 31, 1999, that a child had been shot at Pat's Food Store and arrived at the scene just after 9:30 p.m. Officer Spraggins testified that a crowd had gathered outside of Pat's Food Store and a woman was yelling out that she had seen three men hanging around Leo High School all evening. Leo High School is located diagonal across the street from Pat's Food Store. The woman stated that she heard the shots fired and they came from the area where the men had been hanging out all night. She gave a general description of the men, calling one of them "Kenny" and another "Mitch." Officer Spraggins went down the alley near Leo High School, where he found shell casings. He continued his search down the alley and observed the defendant jumping

over a fence.  Spraggins and his partner chased the defendant and arrested him in the alley.

Officer

1-02-1244

Spraggins and his partner transported the defendant to the sixth district station.

At the sixth district, the defendant was interviewed by Detectives Robert Arteaga and Sylvia Van Witzenberg between 3 a.m. and 4 a.m. on August 1.  The results of a gunshot residue test taken earlier were inconclusive.  The interview lasted 20 to 30 minutes and the detectives told the defendant he was not being charged and he would be released from the sixth district.  Detective Arteaga testified the defendant agreed to help them with the investigation and voluntarily went with the detectives to Area 2.

Also on August 1, 1999, the codefendant, Kevin Johnson, was taken into custody.  Kevin Johnson identified the defendant as the shooter and gave a court-reported confession.  Thereafter, Detective Arteaga went to 7927 South Sangamon to recover the murder weapon.

At approximately 2 p.m. on August 1, the defendant was placed under arrest after being identified as the shooter.  Detectives Van Witzenberg and Arteaga interviewed him again at Area 2 after informing him that he had been named as the shooter.  Later that evening, at approximately 10 p.m., the defendant was interviewed by Assistant State's Attorney (ASA), Arunas Buntinas.  That interview lasted approximately 45 minutes.  ASA Buntinas interviewed the defendant again for about two hours at 4 a.m. on August 2.

On August 2, the police interviewed a witness to the shooting, Mary Lewis.  On July 31, Mary Lewis was standing in front of her house at 7812 Sangamon in Chicago.  Pat's Food Store

3

is located at the end of her block and Leo High School is located diagonally across from Pat's Food Store. Mary Lewis saw the defendant and two other men standing by the corner near Leo

1-02-1244

High School. She recognized all three of the men as she had seen them before. Ms. Lewis spent most of the evening on her front stoop because she wanted to go to Pat's Foods but was waiting for the defendant and the others to "clear the corner" so she could walk down the street. At approximately 9:30 p.m., Ms. Lewis heard gunshots and saw sparks coming from the location where the defendant had been standing near Leo High School. Ms. Lewis ran into her house, put on some shoes, and then went to the corner, to Pat's Food Store. When Ms. Lewis arrived at Pat's Food Store, she was yelling, "Kenny and Mitch did it."

At approximately 7 p.m. on August 2, Detectives Van Witzenberg and Arteaga showed the defendant a surveillance tape from Pat's Food Store. The tape showed the inside of the store at the time of the shooting. This interview lasted approximately 45 minutes. Later on August 2, at approximately 11:30 p.m., ASA Buntinas interviewed the defendant again for 30 to 45 minutes and continued to interview the defendant periodically throughout the night. At 2 a.m. on August 3, the detectives and ASA Buntinas again showed defendant the surveillance tape from Pat's Foods. Between 5 a.m. and 10 a.m. on August 3, ASA Buntinas periodically interviewed the defendant. Throughout all of this questioning, the defendant denied any involvement in the shooting.

At approximately 4 or 5 p.m. on August 3, Detectives Van Witzenberg and Arteaga were notified of an outstanding warrant for the defendant in Bridgeview. At 10:30 p.m. on August 3,

4

the detectives informed the defendant that he would be going before a judge in Bridgeview the following morning.  The detectives arranged for the defendant to call his mother to let her know

he was going to Bridgeview.  However, there was a problem processing the warrant so the defendant was never taken to Bridgeview and he remained in the interview room in Area 2.

On August 4, Detective Clarence Hill transported a second witness, Demetrius Jones, to Area 2 to view a lineup.  On the night of the shooting when the police had arrived at the scene, Jones told one of the officers that he had seen what happened.  A large crowd had gathered and the officer asked Jones to step aside while he cleared away the people.  Jones waited and then decided to contact the police later as the scene was chaotic.  Jones spoke to a police officer the day after the shooting while police were investigating, but he was reluctant to tell the police what he had seen because gang members were nearby.  Jones told the officer that he had seen some of what happened and he gave the officer his telephone number.  On August 4 at approximately 7:45 p.m., Jones viewed a lineup and identified the defendant as the man he had seen after the shooting standing behind Leo High School holding a rifle.

After the lineup, the detectives told the defendant he had been picked out and took him back to the interview room.  They left him there unattended.  A few minutes later, Detective Van Witzenberg looked inside the room and saw the defendant cutting his wrists with a piece of metal.  Detective Van Witzenberg and several others rushed in and stopped the defendant and tried to apply paper towels to the defendant's wrists.  An ambulance arrived and transported the defendant to the hospital.  The defendant was returned to Area 2 about three hours later, at

5

11 p.m., and put back in the interview room.

On August 5 at approximately 1:30 a.m., Detectives Van Witzenberg and Arteaga interviewed the defendant again for about 30 minutes. After the interview, the defendant was taken to the bathroom. As he returned to the interview room, he saw ASA Torreya Hamilton sitting at a desk. The defendant stated that he wanted to speak to the assistant State's Attorney. ASA Hamilton interviewed the defendant twice in the early morning hours of August 5. Thereafter, at approximately 9:15 a.m. on August 5, the defendant gave his videotaped statement - the first videotaped statement ever taken in Illinois. The statement was taken 91 hours after the arrest of the defendant.

The defendant was taken before a judge for a probable cause hearing the morning of August 6, more than 115 hours after his arrest.

The trial court found that the defendant had given his statement voluntarily and denied his motion to suppress the statement. We acknowledge that the trial judge ruled on the voluntariness of defendant's statement in light of allegations of police misconduct. We further acknowledge that testimony from the suppression hearing was elicited within the context of defendant's argument that his statement was the result of mistreatment by the police. The testimony is extensive and we find it sufficient for us to review whether the defendant's statement was voluntary.

## DISCUSSION

We first address the argument in defendant's supplemental brief that the illegal delay in arraignment rendered his confession, given during the period of delay, inadmissible as a matter of law. The Illinois Supreme Court recently held that the delay in arraignment of a defendant is

6

1-02-1244

only one factor to be considered in determining the voluntariness of a confession procured during the delay. People v. Willis, 215 Ill. 2d 517, 831 N.E.2d 531 (2005).

Under the fourth amendment of the United States Constitution, a defendant arrested without a warrant has the right to a probable cause hearing as a prerequisite to an extended restraint on liberty. Gerstein v. Pugh, 420 U.S. 103, 114, 43 L. Ed 2d 54, 65, 95 S. Ct. 854, 863. The Supreme Court has held that a judicial determination of probable cause within 48 hours of arrest generally passes constitutional muster. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 114 L. Ed 2d 49, 63,111 S. Ct. 1661, 1670. When a probable cause determination is not made within 48 hours of arrest, the defendant no longer has the burden to show unreasonable delay. The burden shifts to the State to show the existence of an emergency or other extraordinary circumstance. McLaughlin, 500 U.S. at 57, 114 L. Ed 2d at 63, 111 S. Ct. at 1670. While there is no separate remedy for violation of the presentment rule, Illinois courts have held that the delay is a factor to be considered when determining whether the confession was voluntary. People v. Willis, 215 Ill. 2d 517, 831 N.E.2d 531; People v. House, 141 Ill. 2d 323, 380, 566 N.E.2d 259 (1990); People v. Dees, 85 Ill. 2d 233, 237, 422 N.E. 2d 616 (1981); People v. Groves, 294 Ill. App. 3d 570, 577, 691 N.E. 2d 86 (1998).

The test is whether a confession has been freely and voluntarily made without compulsion or inducement or whether defendant's will was overcome at the time he confessed. People v. Ballard, 206 Ill. 2d 151, 177 (2002). In determining the voluntariness of a confession, the totality of the circumstances should be considered, including, but not limited to, the following: defendant's age, education, background experience, mental capacity, and intelligence;

7

defendant's physical condition at the time of questioning; the duration of detention; the duration of questioning; whether defendant was advised of *Miranda* rights; and whether defendant was subjected to physical or mental abuse. Ballard, 206 Ill. 2d at 177.

### AGE, EDUCATION, EXPERIENCE
### MENTAL CAPACITY, INTELLIGENCE

The record reflects that at the time of his arrest the defendant was 23 years old with an eighth-grade education. The defendant was an experienced felon well acquainted with the criminal justice system. He had previous convictions for armed robbery, attempted murder, unlawful use of a weapon by a felon, retail theft, possession of a stolen automobile, and criminal trespass to a vehicle. At the time of his arrest, he had an attempted murder case pending in Bridgeview and he was represented by an attorney in that case. The record does not indicate any problems with defendant's mental capacity or intelligence.

### PHYSICAL CONDITION AT TIME OF QUESTIONING

Defendant testified he was threatened and beaten by various police officers during the repeated questioning which occurred while he was detained. For the first 100 hours of this detention, he denied involvement in the homicide. The record reflects that after 100 hours in custody, when defendant made his first incriminating statement, he had returned from Roseland Hospital, where he had received stitches to his wrist after he cut his wrist with a soda can. Force had been used by the police in their attempts to stop the bleeding when they first discovered him injured in the interview room. The trial court, in addressing the use of force, indicated, "The court finds that perhaps while force was used, it may have been considered somewhat excessive, defendant was thrashing around on the floor, he was resistant, he wasn't allowing the police to

help him stop the bleeding from the cut on his wrist, and there wasn't any consistency, it did not contribute to any statements he subsequently gave. Even Mitchell admits that."

The record reflects the defendant returned from the hospital on August 4, 1999, around 11 p.m., to interview room 3 at Area 2. Defendant testified that during that time, the wrist which had just received stitches was handcuffed by Detective Van Witzenberg to the ring in the interview room and he was in constant pain. Van Witzenberg refused to loosen the handcuff. Van Witzenberg denies this version of the circumstances surrounding defendant's detention before he gave his first incrimination statement. However, what is not disputed is that 1 ½ hours passed until Detective Van Witzenberg returned to interview room 3, together with Detective Arteaga, at 1:30 a.m. on August 5, 1999, and again questioned defendant, at which point he gave his first incriminating statement. The credibility of Van Witazenberg and Arteaga is critical because defendant gave his first incriminating statement to them after 100 hours in custody. Van Witzenberg was the only detective present for the videotaped confession.

The record reflects inherent inconsistencies in the trial judge's evaluation of the detectives' credibility. Detective Van Witzenberg is the same detective who, together with Detective Arteaga, testified that defendant voluntarily helped the police investigate the homicide and willingly stayed in interview room 3 on August 1, 1999, with the door locked, from 6 a.m. until 2 p.m. Detectives Van Witzenberg and Arteaga testified they spoke to defendant for 20 to 30 minutes around 4 a.m. on August 1, 1999, and told him he was not going to be charged, but released. By that time witness Marie Coffey had told the police that the person she had seen running from the scene of the shooting was not the defendant. Coffey identified codefendant

Kevin Johnson. According to Van Witzenberg and Arteaga, defendant agreed to help the police; voluntarily accompanied them from the sixth district to Area 2 around 6 a.m.; and willingly stayed in interview room 3 for the next eight hours, with the door locked. Van Witzenberg and Arteaga testified that on August 1, 1999, at 2 p.m., defendant was told he was identified as the shooter and placed under arrest.

The trial judge found defendant's initial detention from 9:45 p.m. on July 31, 1999, to 6 a.m. on August 1, 1999, to be lawful; however, the trial judge rejected Van Witzenberg and Arteaga's version of the circumstances surrounding defendant's eight hours of detention on August 1, 1999, from 6 a.m. to 2 p.m., finding that detention unlawful. The trial judge, however, accepted their version of the circumstances surrounding defendant's continued detention from 2 p.m. on August 1, 1999, until his *Gerstein* hearing five days later on August 6, 1999, finding that detention lawful.

Van Witzenberg and Arteaga were present during defendant's repeated questioning and repeated denials for the first 100 hours of detention. They were also present for the incriminating statements made by defendant after 100 hours of detention. Their credibility is critical regarding defendant's physical condition during his lengthy detention. The record reflects inherent inconsistencies in the trial judge's resolution of the detectives' credibility. Inconsistent credibility findings preclude deference. As such the trial judge's findings regarding testimony provided by these witnesses as to defendant's physical condition during repeated interrogation is not entitled to deference and is against the manifest weight of the evidence. See People v. Chapman, 194 Ill. 2d. 186, 214 (2000) (where a trial court's ruling on a motion to

suppress a confession involves factual determinations and credibility assessments, a reviewing court will not disturb the ruling unless it is manifestly erroneous).

## MIRANDA WARNINGS

The defendant was an experienced criminal well acquainted with his *Miranda* rights. It is undisputed that during the repeated interrogation which occurred during the first 100 hours of detention defendant denied participation in the homicide. Defendant testified he was aware of his *Miranda* rights and repeatedly to no avail asked Van Witzenberg if he could call the lawyer who was representing him on his pending attempted murder case. Van Witzenberg testified that defendant never asked to call his lawyer. As previously noted, the record reflects inconsistencies in the trial judge's findings regarding Van Witzenberg's credibility.

## DURATION OF DETENTION AND QUESTIONING

As noted earlier, *Gerstein* requires a defendant arrested without a warrant has the right to a prompt probable cause hearing. Gerstein, 420 U.S. at 114, 43 L. Ed 2d at 65, 95 S. Ct. at 854. Illinois has codified the *Gerstein* rule, however the Illinois statute does not provide a remedy for its violation. 725 ILCS 5/109-1(a), 109-2(a) (West 1996). The "promptness requirement of *Gerstein*" requires a judicial determination of probable cause within 48 hours of arrest. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 114 L. Ed 2d 49, 63, 111 S. Ct. 1661, 1670.

In this case, a judicial determination of probable cause was not made within 48 hours of arrest. The defendant was arrested at 2 p.m. on August 1, 1999, and presented before a judge for a probable cause determination during the morning hours on August 6, 1999 ─ more than 110 hours later. He agreed to give a videotaped confession approximately 85 hours after his

custodial detention began. The 85-hour detention before the defendant made his confession far exceeds the 48-hour period for a presumably reasonable delay. Thus, the burden falls on the State to show an emergency or extraordinary circumstance is to blame. McLaughlin, 500 U.S. at 57, 111 S. Ct. at 1670.

Here, we find no indication in the record the delay was the result of an emergency or extraordinary circumstance. It is undisputed that defendant was questioned repeatedly by police and prosecutors during the first 108 hours of the 5 ½ days he was detained before he was brought to court for a *Gerstein* hearing. The testimony of various State witnesses, including police and prosecutors, demonstrates the fact that repeated questioning of defendant occurred: (1) at the sixth district, around midnight on July 31, 1999, defendant was interviewed for 15 to 20 minutes by Detectives Van Witzenberg and Arteaga; (2) at 4 a.m. on August 1, 1999, the detectives had a 20- to 30- minute conversation with defendant at the sixth District; (3) at Area 2 on August 1, 1999, the detectives interviewed defendant for approximately 20 minutes after 2 p.m., when defendant was informed he was under arrest; (4) at Area 2 on August 1, 1999, shortly before midnight, ASA Buntinas together with Van Witzenberg interviewed defendant for 30 to 45 minutes; (5) at Area 2 on August 2, 1999, at 4 a.m., ASA Buntinas together with Van Witzenberg interviewed defendant for 30 to 45 minutes; (6) at Area 2 on August 2, 1999, around 7 p.m., Van Witzenberg and Arteaga interviewed defendant for 30 to 45 minutes and viewed the video from the store three or four times; (7) at Area 2 on August 2, 1999, around 11:30 p.m., ASA Buntinas, with Van Witzenberg and Arteaga, interviewed defendant for about two hours; (8) ASA Buntinas continued to interview defendant into the early morning hours of August 3,

1-02-1244

1999, viewing the store video tape with defendant around 2 a.m. in the presence of Van Witzenberg and Arteaga; and (9) ASA Buntinas alone continued to interview defendant during a five-hour span of time on August 3, 1999, from 5 a.m. until 10 a.m. with occasional breaks in the interview. During these various interviews defendant continued to deny his involvement in the shooting.

On August 3, 1999, Arteaga told defendant that he had a warrant and defendant would be transported to Bridgeview on August 4, 1999. Defendant was allowed to call his mother around 10:30 p.m. on August 3. The fact defendant did not communicate with a family member until he was in custody for approximately 72 hours is a factor to be considered in determining the admissibility of defendant's confession. People v. Hadnot, 163 Ill. App. 3d 215 (1987).

By 9:30 a.m. on August 4, 1999, defendant had been in custody for 84 hours. Defendant was not transported to Bridgeview on August 4 because the warrant had not been lodged through the "LEADS" system; however, that fact does not explain why defendant was not taken to court for a *Gerstein* hearing. Defendant could have had his *Gerstein* hearing and at some later point could have been transported to Bridgeview to clear up the warrant. ASA Buntinas testified that as of August 3, 1999, defendant was not charged with anything other than the warrant.

Moreover, the warrant was generated by the instant case. The warrant was for violation of bail bond in that defendant, while on bond, committed the murder in the instant case. Not only was defendant not charged with the murder in the instant case when the warrant was issued, but defendant had not been identified in the lineup, nor had he made any incriminating statements before the warrant issued on August 3, 1999. The documents accompanying the

13

warrant included codefendant Kevin Johnson's statement implicating defendant.

The trial judge addressed the problems with the warrant and found the detectives did not act in bad faith in attempting to transport the defendant to Bridgeview. Significantly however, the trial judge failed to address the lack of a *bona fide* emergency or extraordinary circumstance to explain the *Gerstein* delay. We do not find the attempt to transport defendant to Bridgeview to be an extraordinary circumstance. First, the detectives testified that they learned of the warrant on August 3 at 4 p.m. --- 50 hours after the detention began. Second, on August 4 the defendant's attorney was waiting for him at Bridgeview because the police told him they were transferring defendant there, yet the police failed to do so. The defendant was never even taken to Bridgeview so there was no reason to delay a probable cause hearing.

During the time defendant was in custody, the police and prosecution repeatedly interrogated defendant in an attempt to elicit a confession, while defendant continued to deny involvement in the homicide. The defendant was told at the time of his arrest that he had been identified as the shooter. In fact, within 48 hours of the arrest, the police had arrested a codefendant and obtained a written statement from him implicating the defendant, recovered the murder weapon, and taken a witness statement from Mary Lewis. The detectives showed the defendant the surveillance video from Pat's Foods Store which showed the victim being shot inside the store. Over the next two days, the defendant was shown this surveillance video several times. The defendant only left the interview room to use the bathroom, he used the telephone once, and he did not speak with an attorney. The only event occurring during the delay before presentment was when the defendant was taken to the hospital, which occurred after 8 p.m. on

14

1-02-1244

August 4, 1999--more than 78 hours after his arrest. The detention already was illegal under *McLaughlin* when defendant was transported to the hospital.

The record reflects no *bona fide* emergency or other extraordinary circumstance to preclude the delay from being considered as a factor that weighs in favor of excluding defendant's confession. The finding by the trial court that the delay was not unreasonable was against the manifest weight of the evidence.

PHYSICAL OR MENTAL ABUSE OR LATENT COERCION

Defendant testified he was repeatedly threatened beaten and told he would be held indefinitely if he did not confess. Every witness produced by the State denied these allegations. Disregarding defendant's testimony that he was told he could be held indefinitely, and disregarding his testimony that he was physically and mentally abused by various officers, the length and circumstances surrounding the detention, including defendant's persistent denial, are factors to be considered regarding the admissibility of his confession. Defendant received stitches on August 4, 1999, and by 11 p.m. he was returned to interview room 3 at Area 2. By this time he had been in custody 98 hours. After cutting his wrist and returning from the hospital where he received stitches, the defendant was not taken to the lockup for transportation to court the next morning but instead returned to interview room 3 at 11 p.m. for further questioning. The defendant sat in the interview room for 1 ½ hours until the interrogation resumed at 12:30 a.m. on August 5, 1999. At this point, the defendant had been in custody for 100 hours and he made his first incriminating statement. Prolonged detention between arrest and confession " 'may serve to amplify the coercion latent in a custodial setting, particularly when there are other indicia of

15

coercion.' " People v. Ollie, 333 Ill. App. 3d 971, 985 (2002), quoting People v. Lekas, 155 Ill. App. 3d 391, 414(1987).

After Van Witzenberg completed her questioning, ASA Hamilton had a short 5-minute discussion with defendant followed by a 45-minute interview with Van Witzenberg present. During the early morning hours of August 5, 1999, ASA Hamilton spoke to defendant at various times before the 9 a.m. videotaped confession was given by defendant. The videotaped confession was taken eight hours after defendant's first incriminating statement to Van Witzenberg at 9 a.m. on August 5, 1999. At that point, the defendant had been in custody 108 hours. During the first 100 hours that defendant had been in custody, it is undisputed that he had been questioned repeatedly and he repeatedly had denied his involvement in the shooting. He had also been treated at the hospital for self-inflicted wounds and then returned to interview room 3, where, 1 ½ hours later, interrogation resumed.

Repeated interrogation and persistent denial are factors to be considered in determining the admissibility of defendant's confession. People v. Travis, 170 Ill. App. 3d 873 (1988). In Travis, the defendant was held in custody for four days and claimed he was repeatedly interrogated, rendering his confession involuntary. The court rejected this argument because the defendant began making incriminating statements the moment he entered the station. Travis, 170 Ill. App. 3d at 886. However, the court noted as follows: "If defendant had not spoken until the last day, his position might have more merit. However, defendant began speaking promptly, and in each subsequent interrogation, after waiving his rights, gave more incriminating information." Travis, 170 Ill. App. 3d at 886. The record reflects the opposite is true in the

instant case, where the defendant persisted in his denials, providing no incriminating information for a period of 100 hours under repeated interrogation.

CONCLUSION

The hearing regarding the voluntariness of defendant's confession took place over a period of 9 months and generated over 900 pages of testimony from 18 witnesses. The trial together with the hearing generated 12 volumes of transcripts and numerous exhibits, including defendant's videotaped confession. A review of this record reflects the trial judge was manifestly erroneous in denying suppression of defendant's confession based on the totality of the circumstances, including, but not limited to, the following: (1) the length of the delay in taking defendant to court for a *Gerstein* probable cause hearing; (2) the failure of the State to demonstrate any *bona fide* emergency or other extraordinary circumstance for the delay; (3) the nature, extent, and duration of repeated questioning by police and prosecution; (4) defendant's physical condition at the time of questioning; (5) defendant's denial, which persisted for 100 hours; (6) the trial court's inconsistent credibility findings; and (7) the trial court's findings of fact, which were contradicted by the record. The failure to suppress defendant's confession was reversible error. Accordingly, we reverse his conviction and remand for a new trial. After thoroughly reviewing the evidence, we are convinced that it was sufficient to support a finding of guilty beyond a reasonable doubt. Under these circumstances, a retrial of defendant would not violate double jeopardy principles. People v. Stafford, 325 Ill. App. 3d 1069, 1075, 759 N.E.2d 115, 120 (2001).

Reversed and Remanded for a new trial.

O'MARA FROSSARD and FITZGERALD SMITH, JJ., concur.