2016 IL App (2d) 140040
Nos. 2-14-0040 & 2-14-0041 cons.
Opinion filed June 28, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 07-CF-1890 |
| | ) ) | Honorable |
| MONTAGO E. SUGGS, | ) ) | Fred Foreman and Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 07-CF-2016 |
| | ) ) | Honorable |
| MONTAGO E. SUGGS, | ) ) | Fred Foreman and Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Burke and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Lake County in case No. 07-CF-2016,

defendant, Montago E. Suggs, was convicted of the first-degree murder (720 ILCS 5/9-1(a)(2)

(West 2006)) of Melinda Morrell. Following that trial, defendant accepted a stipulated bench trial in case No. 07-CF-1890, in which he was convicted of the attempted murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2006)) of Francisco Garcia and attempted armed robbery while armed with a firearm (720 ILCS 5/8-4, 18-2(a)(2) (West 2006)). Defendant appeals, arguing that (1) the trial court erred in denying his motion to suppress his custodial statement, because, when he made it, he had been held in custody for 98 hours and the State did not seek a prompt judicial determination of probable cause to arrest; and (2) the State improperly assessed a $750 public-defender fee against him. We affirm defendant's convictions but vacate the imposition of the public-defender fee.

¶ 2                                      I. BACKGROUND

¶ 3     We begin by summarizing the pertinent facts appearing in the record. On May 4, 2007, defendant obtained a $200 loan from the Payday Loan facility located in Kenosha, Wisconsin. Defendant promised to pay $244 to Payday Loan by May 17, 2007. On May 14, 2007, and on May 17, 2007, defendant obtained two loans in the amount of $300 from the Check 'n Go in Waukegan. Morell processed each of these transactions.

¶ 4     The Waukegan Check 'n Go was located in a strip mall near the intersection of Green Bay Road and Crescent Avenue. The Check 'n Go was a payday lender, offering relatively high-interest-rate loans for a generally short amount of time. Due to the company's staffing issues, Morrell had been transferred from a facility in Round Lake and worked, generally alone, in the Waukegan facility.

¶ 5     During the morning of Monday, May 21, 2007, defendant was driving his green Lincoln Town Car. Defendant was stopped for speeding. The stop revealed that defendant's license had been revoked, and the officer took defendant into custody. Defendant's car was towed by Roger's Towing. When the officer informed defendant that his car would be towed, defendant

became upset.  When defendant was booked, it was revealed that he had no cash with him.  Defendant was soon released on his own recognizance.

¶ 6     A short time after defendant's release, the police received a complaint about a man panhandling at a nearby gas station.  The officer who had arrested defendant investigated.  When the officer reached the gas station, he observed defendant in the gas station's parking lot.  The officer spoke with defendant, and defendant said that he was trying to get someone to give him a ride home.  After receiving permission from his supervisor, the officer gave defendant a ride.  At about 10:45 a.m., the officer left defendant at Sheridan Road and Yorkhouse Road.

¶ 7     Defendant stole a bike near where he had been dropped off.  Defendant pedaled into Waukegan and stole a car.

¶ 8     On May 21, 2007, the Waukegan Check 'n Go started its business day with about $4,000 in cash on hand.  Two drawers in the front of the store each contained $1,000, and a time-delayed safe in the office area contained $2,000.  Morrell talked with her coworker at the Round Lake facility during the day, the last time just after 2 p.m.

¶ 9     Sometime after 2 p.m., defendant arrived in the stolen car at the Waukegan Check 'n Go.  He parked the car in the parking lot of the strip mall, on the opposite end from the Check 'n Go.  Defendant then walked behind the stores in the strip mall, coming around the corner of the Check 'n Go before entering the facility.  In doing this, he would not have been visible through the front windows of any of the other stores in the strip mall.

¶ 10    Defendant entered the Check 'n Go, encountering Morrell.  Defendant pulled a gun.  At some point defendant, in an attempt to gain or maintain her cooperation or acquiescence, told Morrell that the money was not worth her life.  After emptying the drawers of bills, leaving some coins in one of the drawers, defendant asked where the surveillance recordings were kept.  Morrell took defendant into the back room, where the safe was located.  There was also a

television displaying the live surveillance footage, as well as a VCR. The VCR was in a stand along with tapes labeled by day of the week.

¶ 11 Defendant had Morrell lie face down on the ground. Defendant stated to police that, as he knelt down, he accidentally discharged his gun, striking Morrell in the back of the head. Defendant retrieved the "Monday" tape that had presumably recorded his entrance into the Check 'n Go. Defendant left the facility and retraced his route around the back of the strip mall to the stolen car.

¶ 12 Defendant drove the stolen car to the Briarwood apartment complex in Waukegan, which was located about a mile from the Check 'n Go. At about 5 p.m., he entered the complex's rental office and encountered several Briarwood employees. Defendant asked for a ride to Roger's Towing to retrieve his impounded Lincoln Town Car. Defendant explained that he needed a person with a valid driver's license to accompany him. The employees explained to defendant that they were working and could not accommodate defendant. Defendant was upset by their refusal, but, eventually, he left the office without incident.

¶ 13 Two employees at Roger's Towing testified that, at about 5 p.m., a person called seeking to retrieve his 1994 Lincoln Town Car. The person represented his identity to be Montago Suggs, and he sought an assurance that the towing company would be open if he came by. One of the employees dithered, noting that Roger's Towing closed at 5 p.m., but then he relented, saying that he had a little work to finish up, so he would be around to let defendant retrieve his car until about 5:15 p.m. That employee testified that he left work that evening at about 5:15 p.m. and no one had come to Roger's Towing to reclaim the Lincoln Town Car.

¶ 14 At about 5:15 p.m., a customer entered the Waukegan Check 'n Go to make a loan repayment. She had been a customer previously and had dealt with Morrell each time she completed a transaction there. Moreover, each time she obtained a loan from the Check 'n Go,

Morrell had been the only employee in the facility. When she entered the facility, she did not see Morrell at her usual station. She peeked around in the office and discovered Morrell's body lying face down, with a pool of blood around her head. She ran next door and asked someone to call 911.

¶ 15    An off-duty Waukegan police officer happened to be in the next-door business when the customer ran in from the Check 'n Go. He initially secured the scene and ascertained that Morrell was, in fact, dead. Other officers arrived and processed the crime scene.

¶ 16    At the scene, police recovered an expended shell casing near Morrell's hip and a spent bullet on the shelf of the VCR stand. Police also determined that the "Monday" surveillance tape was missing; the other six tapes were present, with "Thursday" stuck in the VCR. The autopsy showed that Morrell had been killed by a single gunshot to the back of her head. The pathologist determined that the gunshot was fired at a range greater than 20 inches to two feet, because no stippling around the wound was observed. Finally, only the cash in the safe remained in the store; the currency in the drawers, totaling a little over $2,000, had been removed.

¶ 17    At about 5:30 p.m., an employee working on his personal car at Roger's Towing heard a man pounding on the front door. The man said that he was there to pick up his car and that someone told him the business would remain open until he arrived. The employee told the man the business was closed and went back to working on his car. Shortly after, the man began pounding on the garage door demanding his car. The employee told the man that he was calling the police. The employee in fact called the police, but the man had left by the time the police arrived. Later, the employee identified the man as defendant.

¶ 18    At about 6:22 p.m., defendant returned to the Payday Loan in Kenosha. There, he paid $244 in cash to pay off his May 4, 2007, loan.

¶ 19    On May 22, 2007, defendant returned to Roger's Towing. He was polite and not agitated

at this time.  After he identified himself, he paid $140 in cash to reclaim his Lincoln Town Car, signing the receipt, "Montago Suggs."

¶ 20    On Saturday, May 26, 2007, shortly before 4 p.m., defendant entered the Ma & Pa convenience store in Beach Park.  Garcia was the only person in the store when defendant entered.  Defendant first asked if the store manager was around; when Garcia said that he was not, defendant pulled a gun and pointed it at him, telling Garcia that the money was not worth his life.  Garcia opened the register and defendant ordered him to lie down on the floor near the register.  Garcia fully complied with all of defendant's commands.  Defendant investigated the office in the back of the store after ordering Garcia not to move.  A customer entered the store, and Garcia heard defendant order the customer to get on the floor.  Defendant came back to the register and ordered Garcia to lie prone.  As Garcia complied, defendant pulled the trigger of the gun, but it only clicked.  In his statement to police, defendant said that Garcia took a swing at his arm holding the gun and that defendant reflexively pulled the trigger but the gun did not fire.  Garcia testified that, after the gun only clicked, defendant looked at the gun in surprise.  At that point, Garcia jumped up as defendant fled from the store.  Garcia triggered the silent alarm, and the customer and Garcia observed defendant drive off in a green Lincoln Town Car.  The customer got the license plate number, and Garcia wrote it down and relayed it to police.

¶ 21    Outside of the Ma & Pa, defendant slipped on wet pavement and fell.  As he fell, he dropped the gun, which police found on the sidewalk outside of the store.  A firearms expert who performed testing on the spent bullet and shell casing recovered at the Check 'n Go opined that both had been fired from the gun defendant admitted using in the Ma & Pa offenses.  The ammunition loaded in the gun's magazine also matched the brand indicated on the shell casing recovered from the Check 'n Go.

¶ 22    Police immediately began to search for defendant and his car.  An officer traveling south

passed defendant traveling north. When the officer performed a U-turn, defendant accelerated and began a high-speed chase. Defendant fled north into Wisconsin. As he came upon a wooded area, defendant suddenly swerved into the woods. The officer maintained his pursuit, coming upon defendant's car abandoned in the wooded area. The officer observed defendant fleeing through the woods. The police quickly cordoned off the wooded area and began a search for defendant. Defendant was eventually apprehended. As he was being escorted to a police car, defendant remarked to the officer that, if he had had a gun, he would have shot himself.

¶ 23   The police brought an understandably shaken Garcia to the wooded area, and he identified defendant as the person who attempted to rob the Ma & Pa and shoot him. Defendant was then taken into custody in Kenosha.

¶ 24   On Saturday, May 26, 2007, at about 6:30 p.m., Detective Erwin Drummond, of the Lake County sheriff's office, and Detective Charles Schletz, of the Waukegan police department and the Lake County major crimes task force, arrived at the Kenosha police department. At about 8 p.m., they both began an interview with defendant about the Ma & Pa offenses. Both officers were in "soft" clothes and unarmed. Defendant was not handcuffed or shackled. The interview was not recorded.

¶ 25   At the beginning of the May 26 interview, Drummond took the lead. Schletz explained later that Drummond took the lead because the Ma & Pa was within the sheriff's jurisdiction. Schletz was interested in defendant because of the similarities between the Ma & Pa offenses and the shooting at the Check 'n Go.

¶ 26   Drummond started the interview by presenting defendant with a preprinted *Miranda* rights form. Drummond read the form to defendant. Defendant initialed the form after each individual right and signed the form, indicating that he understood those rights. Drummond testified that, in addition to signing the form, defendant indicated to him that he understood each

right and the entire form. The form included a sentence averring that defendant had not been subjected to any "persuasion" or "coercion." Defendant appeared to be unimpaired by any drugs or alcohol. Defendant did not complain about fatigue or an upset stomach. Defendant had no injuries. Defendant was offered food and drink repeatedly. Defendant was allowed to use the restroom if he wished. Neither Drummond nor Schletz yelled at defendant during the interview; they also did not threaten defendant or make promises to defendant in order to induce him to talk. Drummond and Schletz took several breaks during the interview, including two separate 30-minute breaks. Defendant never indicated during this interview that he did not want to talk to the police, that he wanted to remain silent, or that he wanted to talk with an attorney.

¶ 27     At about 2 a.m., on May 27, 2007, the interview was terminated. Defendant mentioned that he was "tired," so the officers decided to end the interview for the day. Additionally, the Kenosha police department was not staffed 24 hours every day, and a Kenosha officer asked Drummond and Schletz to end the interview so the Kenosha facility could be closed for the night. Particularly, defendant did not ask to terminate the interview at that time, and he agreed to resume the interview later that day. Defendant remained in the custody of the Kenosha police because there was a Wisconsin probation hold placed on him. Kenosha officers informed Schletz that, because of the Memorial Day holiday, defendant would not appear before a Wisconsin judge about the probation hold until Tuesday, May 29, 2007.

¶ 28     At some point during the day of May 27, 2007, defendant was charged by information with one count of attempted robbery of the Ma & Pa. Additionally, a judge in Lake County held an *ex parte* hearing and determined that probable cause existed to arrest defendant for the Ma & Pa offenses and signed a warrant for defendant's arrest.

¶ 29     Later in the morning of Sunday, May 27, 2007, Schletz and Deputy Chief George Manis of the Lake County sheriff's office (Manis was then a detective sergeant) arrived at the Kenosha

police department to interview defendant. The interview began shortly before noon. Manis and Schletz were both dressed in plain clothes and unarmed. Defendant was not handcuffed or shackled. This interview was video recorded.

¶ 30 At the beginning of the interview, Schletz readvised defendant of his *Miranda* rights. Schletz did not use a new form; rather he read from the May 26, 2007, form and ascertained that defendant still understood the rights presented and wished to speak to the police. Manis then asked defendant to explain what had happened on Saturday. The officers reported that defendant did not seem impaired, and defendant answered Manis's questions. Defendant appeared "calm," and he spoke in a "cordial, low" tone. The officers testified that no threats or promises were used to get defendant to speak during that interview. Defendant related the events summarized above about the Ma & Pa incident. At about 12:30 p.m., Manis and Schletz suspended the interview so that they could prepare a written statement. Defendant had earlier refused to personally handwrite a statement. When the interview was suspended, defendant had not complained of injury or illness, and defendant had not stated that he did not wish to talk to the officers, that he wished to remain silent, or that he wished to speak with an attorney.

¶ 31 The officers spent the next 80 minutes preparing the written statement. At about 1:50 p.m., the interview resumed with Manis presenting the written statement to defendant. Defendant read the statement, and Schletz also read the statement aloud to defendant. Defendant asked to include additional information. Defendant added a few lines in his own handwriting to the statement. Defendant initialed the lines he added and then signed the statement. At about 2 p.m., Manis and Schletz terminated the interview. Manis had no further contact with defendant.

¶ 32 On Sunday, May 27, 2007, at about 2:30 p.m., Schletz and Detective Ulloa, of the Waukegan police department and the Lake County major crimes task force, began a video-recorded interview with defendant. They focused on the Check 'n Go murder. At the outset,

Schletz advised defendant of his *Miranda* rights, this time using a new preprinted form. Defendant again signed the form.

¶ 33    The interview lasted for about 60 to 70 minutes. At the end of that time, Ulloa accused defendant of being involved in the Check 'n Go murder. Defendant denied the accusation. Defendant then stated that he wished to speak with an attorney. Defendant told the officers to return him to the jail and to spend their time looking for the actual perpetrator. We note that, in ruling on defendant's motion to suppress, Judge Foreman made the factual finding that the interview was then immediately terminated. The record does not support that finding, as defendant and the officers continued speaking for a few minutes. However, they spoke about nothing substantive related to the Check 'n Go murder; instead it appears that defendant queried about what would happen to him next. The record does clearly and amply support that the officers posed no further questions about the Check 'n Go murder and that they substantially and substantively complied with defendant's request to terminate the interview.

¶ 34    On Memorial Day, Monday, May 28, 2007, Schletz returned again to the Kenosha police department. He did not speak with defendant.

¶ 35    On Tuesday, May 29, 2007, Schletz and an evidence technician returned to Kenosha. A Kenosha police department liaison officer assisted Schletz in obtaining a search warrant for defendant's DNA and fingerprints. The evidence technician swabbed defendant's cheeks and then escorted defendant to the identification area in the Kenosha police department, where he took defendant's fingerprints. At approximately 5:12 p.m., the evidence technician informed Schletz that defendant had asked specifically to speak to Schletz.

¶ 36    Schletz went into the identification area and reminded defendant that he had previously asked to speak to an attorney and had stated that he did not wish to speak to the police. Schletz informed defendant that, if he wanted to resume speaking to the police, he would be readvised of

his *Miranda* rights. Defendant assured Schletz that he wished to speak to him. Defendant was placed into an interview room with video-recording capabilities, and Schletz had defendant "memorialize" what he had told the evidence technician about asking to resume speaking to the police. Schletz then administered *Miranda* rights to defendant. After this brief resumption, in which defendant reiterated that he wished to speak to the police and to Schletz in particular, the interview was suspended and defendant was provided with food.

¶ 37    At about 6:35 p.m., Schletz resumed the interview. The questioning continued until close to 9 p.m., when Ulloa interrupted the interview and called Schletz from the room. Outside the presence of defendant, Ulloa told Schletz that the lab had determined that the spent bullet from the Check 'n Go was a ballistic match for the gun that defendant admitted using at the Ma & Pa.

¶ 38    Armed with this new information, Schletz resumed the interview. From shortly after 9 p.m. until about 9:30 p.m., Schletz focused on the Check 'n Go murder. Schletz informed defendant about the ballistic match.

¶ 39    A break was taken around 9:30 p.m. The interview resumed at about 11 p.m., and it continued for another 30 minutes, at which time it was ended for the day.

¶ 40    On Wednesday, May 30, 2007, Schletz once again returned to the Kenosha police department to interview defendant. At about 11:50 a.m., Schletz commenced the interview by giving defendant a fresh reading of his *Miranda* rights from a new preprinted form. The interview continued throughout the afternoon, with at least two 40-minute breaks. At about 5:04 p.m., defendant made his first self-incriminating statement concerning the Check 'n Go shooting. For the next 25 minutes, defendant filled in the details of the shooting. At about 5:30 p.m., a food break was taken. The interview resumed at roughly 6:15 p.m. and continued until about 7:05 p.m. Defendant's statement was typed, defendant read and signed it, and the interview ended around 7:30 p.m.

¶ 41    On June 6, 2007, defendant was charged in a three-count complaint with the murder of Morrell.    The same day, defendant appeared before the Lake County circuit court.    At the arraignment, defendant's counsel stated, "We waive *Gerstein*."[1]    The court determined that there was probable cause to have arrested defendant for the Morrell murder.

¶ 42    On March 24, 2008, defendant filed a motion to suppress his statement about the Check 'n Go murder, alleging that he had not been presented for extradition with "all practicable speed."

¶ 43    Following a hearing, the trial court denied defendant's motion to suppress.    The court considered the issues of whether, after defendant invoked his right to counsel, he reinitiated conversations with the police and whether defendant's statement was voluntary.    The trial court held:

"[T]he Defendant here invoked his right to counsel and questioning immediately ceased.[2]    This request was honored on Sunday and Monday, until Defendant asked to speak with Detective Schletz.    After Defendant requested to speak with him, Schletz had Defendant brought to an interrogation room, where he reminded him that the last time they spoke, Defendant requested a lawyer and said he no longer wanted to talk.    Schletz

_____

[1] *Gerstein v. Pugh*, 420 U.S. 103 (1975) (holding that a defendant arrested without a warrant and charged by an information must be promptly presented to a neutral magistrate for a determination whether probable cause to arrest exists).

[2] As noted, this factual finding is against the manifest weight of the evidence.    *People v. Swanson*, 2016 IL App (2d) 150340, ¶ 27.    However, this error does not change the propriety of the trial court's judgment, because, even though the questioning did not immediately cease, all substantive questioning ceased.

then advised Defendant that any decision to speak was 'up to [Defendant].' Defendant stated he 'changed [his] mind' because he wanted to 'help with the investigation,' and further stated, 'I want to show whatever I can. My cell phone records. Whatever.' Based on the forgoing [*sic*], the court finds the Defendant evinced a desire and willingness to engage in a generalized discussion about the investigation."

¶ 44   The trial court then turned to the question of whether defendant's statement was voluntary. The court first properly recited the applicable standards regarding a knowing and intelligent waiver of the right to remain silent and determined that defendant's waiver was knowing and intelligent and not the product of police coercion or intimidation. The court then turned to the voluntariness inquiry. The court held:

"Generally, an accused in custody must be taken before a neutral magistrate for a probable cause hearing within 48 hours of arrest. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Where an accused individual does not receive a probable cause determination within 48 hours, the State bears the burden of demonstrating the existence of a *bona fide* emergency or other extraordinary circumstance to justify the delay. *People v. Willis*, 215 Ill. 2d 517, 527 (2005) (citing *McLaughlin*, 500 U.S. at 57). The State may still violate *McLaughlin* where a probable cause hearing is held within 48 hours; however, the defendant bears the burden of proving the delay was unreasonable. *Willis*, 215 Ill. 2d at 527.

\*\*\*

In determining whether a confession was voluntary, the court considers the totality of the circumstances including the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; the duration of the interrogation; the presence of *Miranda* warnings; the presence of any

physical or mental abuse; and the legality and duration of the detention. *Id.* at 536.

* * *

Here, Defendant was 23 years old, is of average intelligence, and was in good physical condition at the time of his detention and interrogation. At the time he was taken into custody, he had significant prior experience with the criminal justice system, having been convicted in Wisconsin of the offense of receiving stolen property; he also had three felony convictions in Illinois for receiving stolen property, and was sentenced to four years in the Department of Corrections on June 3, 2004.

Although Defendant's individual interrogation sessions were relatively long, he was given frequent breaks and was repeatedly offered food, drink, and trips to the restroom. Defendant was advised of his *Miranda* rights and indicated he understood and knowingly waived each prior to the interrogations. He has made no claim of any physical or mental abuse, nor is there evidence of any. The tone of the interrogations was not forceful or coercive, but conversational in nature. Defendant does not appear tired, confused, or otherwise worn down in the video tapes of the interrogation sessions.

The court also notes that Defendant was initially in lawful custody. *See* [*People v. Nicholas*, 218 Ill. 2d 104, 120 (2005)]; [*People v. Deloney*, 359 Ill. App. 3d 458, 468 (2005)]. Unlike [in *People v. Sams*, 367 Ill. App. 3d 254 (2006)], there is no basis for finding the police intentionally delayed in order to investigate the murder charge here. Police had probable cause to arrest the Defendant for the robbery of [the Ma & Pa] at the time he was apprehended. Although that probable cause related to a different charge, the court finds it is relevant to making a factual determination as to whether the police unreasonably delayed bringing the Defendant before a magistrate. Moreover, ballistic evidence linking the Defendant to the Check 'n Go murder became available on Monday,

May 29—around 48 hours into the Defendant's detention. As such, the police had probable cause to arrest the Defendant for the murder at that point. As in *Deloney*, the court finds police were 'diligently engaged in the investigation and were not indifferent to defendant's presence or willfully disregarding *McLaughlin*. [*Deloney*,] 359 Ill. App. 3d at 439 (citing *Willis*, 215 Ill. 2d at 538).

However, all of these factors must be balanced with the fact that Defendant had been detained 98 hours or more without a probable cause hearing at the time he made the inculpatory statements. This is significantly longer than the defendant was detained in *Willis*. Nonetheless, *Willis* directs that an illegal detention does not render an otherwise voluntary confession inadmissible. [*Willis*,] 215 Ill. 2d at 533-35. It is 'merely a factor to be considered on the question of voluntariness.' *Id.* at 533 (internal citation omitted). As such, the ultimate issue is whether the Defendant's confession was voluntary.

Having considered the totality of the circumstances, the court finds it was. In addition to the factors detailed above, the court notes it found Detective Schletz's testimony to be credible. Moreover, although the detention in this case was lengthier than that in *Willis*, the court here has the significant added benefit of being presented with contemporaneous videotape of the interrogation sessions. This evidence permits the court to observe the nature and tone of the interrogations, as well as the demeanor of Schletz and Defendant through an independent lens. This is a considerable distinction from the evidence presented in *Willis* because the court is able to view and assess the interrogation as it occurred rather than relying solely on the testimony of witnesses.

Having viewed the video evidence, the court finds Defendant's statements were not the result of his prolonged detention. This is supported by the fact that Defendant's interrogations were not coercive. The tape demonstrates Schletz did not use threats or

intimidation to obtain a confession. Nor did he badger the Defendant into making an inculpatory statement. To the contrary, the tape shows a conversational, ongoing dialogue between [Schletz] and Defendant regarding the events leading up [to] the offenses, and the offenses themselves. The court further notes that Schletz scrupulously observed Defendant's requests, even as he attempted to resolve a very serious case. Under the totality of the circumstances and, in particular, having considered the tone of the interrogation and demeanor of the parties, the court finds Defendant's statements were the product of free will.

The court notes the *Willis* [c]ourt noted it was 'troubled by the delay in presenting the defendant before a judge for a probable cause determination' and took care to note that '[a]t some point, a delay will become so long that it alone is enough to make a confession involuntary.' [*Willis*,] 215 Ill. 2d at 538 (citing *People v. Manning*, 243 Mich. App. 625, 643 (2000)). The court is similarly troubled by the delay here. However, as in *Willis*, it finds that, under the totality of the circumstances, Defendant's statements were voluntary."

¶ 45 The motion to suppress was reopened later when a Wisconsin police officer came forward with an allegation that Schletz spoke to defendant alone, without a recording or other observer, for a period of time. The trial court heard the officer's testimony and considered the testimony from the original suppression hearing before reaffirming its judgment on the motion to suppress. The court specifically noted that the Wisconsin officer's testimony was not credible and that Schletz's testimony was credible.

¶ 46 The matter eventually advanced to trial on the Morrell murder (case No. 07-CF-2016). The above-summarized evidence was presented and, on September 27, 2013, the jury returned a verdict of guilty of first-degree murder.

¶ 47    On November 12, 2013, defendant filed a motion seeking judgment notwithstanding the verdict or a new trial.  Defendant argued that the trial court erred in denying his motion to suppress, because questioning had not immediately ceased when defendant invoked his right to counsel.  Defendant also argued that the State violated statutory authority when Schletz interrogated defendant without recording the interview.  The trial court denied defendant's motion.

¶ 48    Also on November 12, 2013, defendant agreed to a stipulated bench trial on the Ma & Pa offenses.  Before proceeding with the stipulated bench trial, the State dismissed the charge of unlawful use of a weapon.  The dismissal order contained check boxes regarding the public-defender fee.  Neither of the check boxes had been checked, and the space to record the amount of a public-defender fee was blank.

¶ 49    The parties stipulated to the evidence presented during the Check 'n Go trial.  Additional stipulations included that the Lincoln Town Car was registered to defendant and that the Ma & Pa was located in Lake County.  The trial court found defendant guilty of attempted murder and attempted armed robbery with a firearm.

¶ 50    On December 10, 2013, the trial court sentenced defendant.  Defendant received an 80-year term of imprisonment for the murder conviction (which included a firearm enhancement).  This sentence was to be served consecutively to both a 30-year term for attempted armed robbery and a 28-year term for attempted murder (which would be served concurrently with each other).  In the Ma & Pa case, defendant was also assessed various fines, fees, costs, and restitution; these included the $750 public-defender fee.  We note that the trial court did not hold a hearing at any time regarding defendant's financial circumstances.

¶ 51    Defendant filed a motion to reconsider his sentence in each case.  On January 7, 2014, the trial court denied defendant's motions to reconsider.  Defendant timely appeals.

¶ 52                                II. ANALYSIS

¶ 53    On appeal, defendant argues that the trial court erred in denying his motion to suppress. Defendant additionally argues that the trial court improperly imposed the public-defender fee. We consider each contention in turn.

¶ 54                             A. Motion to Suppress

¶ 55    Defendant initially contends on appeal that the trial court improperly denied his motion to suppress. Defendant argues that the State failed to promptly present him for a judicial determination of whether probable cause existed to believe that he had committed the Check 'n Go offense. Instead, he was held with no probable-cause determination and interrogated over a 98-hour period before he confessed. Defendant argues that his fourth-amendment right against unlawful detention was infringed (U.S. Const., amend. IV; *Gerstein*, 420 U.S. 103) and that the extremely long delay contributed to making his statement to the police involuntary.

¶ 56                             1. Standard of Review

¶ 57    As an initial matter, we consider the standard by which we review a trial court's ruling on a motion to suppress. When reviewing the trial court's ruling, we use the by-now familiar bifurcated standard. The trial court's factual determinations are upheld unless they are against the manifest weight of the evidence. *People v. Absher*, 242 Ill. 2d 77, 82 (2011). We then consider the established historical facts in relation to the issues presented, drawing our own conclusions in deciding what relief, if any, should be granted. *Id.* The ultimate legal question, then, of whether suppression was warranted, is reviewed *de novo*. *Id.*

¶ 58                             2. Procedural Default

¶ 59    Defendant argues on appeal that the failure to present him before a neutral magistrate for a probable-cause hearing within 48 hours of his arrest, in violation of *Gerstein* and *McLaughlin*, required the suppression of his statement to police regarding the Check 'n Go murder.

Defendant, however, did not raise the *Gerstein*/*McLaughlin* issue in the trial court.  In order to preserve an issue for review, the defendant must both make a timely objection at trial and raise the issue in a written posttrial motion.  *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).  Defendant did file a motion to suppress his statement, and this serves the same purpose in the *Enoch* analysis as a timely objection.  *People v. Burnfield*, 295 Ill. App. 3d 256, 262 (1998).  Defendant also filed a written posttrial motion alleging that the trial court erred in denying his motion to suppress.  At a first pass, then, defendant has adequately raised the propriety of the trial court's ruling on the motion to suppress.

¶ 60    It is nearly axiomatic, however, that a specific objection waives all unspecified grounds for objecting.  *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 63.  Defendant's written pretrial motion to suppress alleged that his statement should be precluded because the State did not act with all practicable speed in presenting defendant for extradition from Wisconsin to Illinois.  Defendant's posttrial motion alleged that the State had not scrupulously and immediately honored his invocation of his rights to counsel and to remain silent, and it also alleged that portions of his questioning had not been recorded.  Thus, defendant's specific objections did not involve the ground he now raises on appeal.  Because his specific objections waived all unspecified grounds (*id.*), defendant has procedurally defaulted the issue he now seeks to raise on appeal (*Enoch*, 122 Ill. 2d at 186).

¶ 61    Defendant argues that, even if we believe that he has procedurally defaulted the *Gerstein*/*McLaughlin* issue, we may still review his arguments under the plain-error doctrine.  Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) codifies the plain-error doctrine, which is a narrow and limited exception to the rule of procedural default.  *People v. Walker*, 232 Ill. 2d 113, 124 (2009).  Under the plain-error doctrine, a reviewing court may consider unpreserved error if either of two conditions is met: (1) a clear or obvious error occurred and the evidence

was so closely balanced that the error alone threatened to tip the result of the case against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and that error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* Under either element of the plain-error doctrine, the defendant bears the burden of persuasion. *Id.* If the defendant fails to satisfy that burden, the result is to honor the procedural default. *Id.* The first step of the plain-error analysis is to determine whether any error occurred. *Id.* This first step requires the reviewing court to substantively review the issue. *Id.* With these principles in mind, we consider defendant's substantive arguments to determine whether any error occurred.

¶ 62                          3. Propriety of Denying Motion to Suppress

¶ 63    Defendant argues that, because of the "remarkably long and unexplained delay before the State sought a judicial probable cause determination," his statement to police regarding the Check 'n Go murder was involuntary. Defendant parses the problem as follows: (1) an arrest must be supported by probable cause; (2) the fourth amendment to the United States Constitution requires a prompt judicial determination of probable cause to support a warrantless arrest; (3) the judicial issuance of an arrest warrant equates to a judicial probable-cause determination; and (4) the State interrogated defendant over a 98-hour period and did not seek a probable-cause determination, through either an arrest warrant or a court hearing, at any time before defendant confessed. Defendant concludes that, as a result, his statement was involuntary.

¶ 64    Our supreme court, in *Willis*, 215 Ill. 2d 517, explained the contours of the law surrounding presentment to a magistrate following a warrantless arrest. We begin our discussion there.

¶ 65    In *Gerstein*, the United States Supreme Court held that, in order to implement the fourth amendment's protections against improper invasions of a person's liberty and privacy, a judicial

determination of probable cause must occur when that person has been subjected to a warrantless arrest. *Id.* at 526 (citing *Gerstein*, 420 U.S. at 112-14). However, the Supreme Court did not mandate a one-size-fits-all solution; instead, the states remained free to fashion their own procedures, so long as they afforded the individual subjected to a warrantless arrest a fair and reliable probable-cause determination either before or promptly after that arrest. *Id.* (citing *Gerstein*, 420 U.S. at 125).

¶ 66 The Supreme Court defined "promptly" in *McLaughlin*. *Id.* at 527. The Supreme Court held that, generally, a judicial determination of probable cause occurring within 48 hours of a warrantless arrest will pass muster; however, *Gerstein* might still be violated if the defendant can show that a lesser amount of time constituted unreasonable delay, such as delay to gather evidence to justify the arrest after the fact, delay to show ill will toward the defendant, or delay simply for the sake of delay. *Id.* (citing *McLaughlin*, 500 U.S. at 56). The Supreme Court further held that, if an arrested individual does not receive a probable-cause determination within the 48-hour window, the detention is presumptively unreasonable and the State bears the burden of demonstrating an emergency or other extraordinary circumstance to justify the detention. *Id.* (citing *McLaughlin*, 500 U.S. at 57).

¶ 67 Our supreme court then examined what sort of remedy would be proper for a *Gerstein*/*McLaughlin* violation. It rejected suppression of the statement as a matter of course. Our supreme court reasoned that the State does not violate the fourth amendment by introducing the evidence obtained in violation of *Gerstein*/*McLaughlin*; instead, the fourth-amendment violation is fully accomplished by the illegal search or seizure, and excluding the evidence cannot undo the injury to the defendant's rights. *Id.* at 531. Our supreme court further reasoned that the exclusionary rule was not borne of constitutional requirements but instead is applied only

after a determination that its deterrent benefits outweigh its substantial social costs. *Id.* at 531-32.

¶ 68    Our supreme court turned to weighing the costs and benefits of applying the exclusionary rule to suppress an otherwise voluntary confession. *Id.* at 532-35. It noted that: (1) other remedies, such as civil rights suits, are available for *Gerstein*/*McLaughlin* violations; (2) the defendants' rights are otherwise protected (*e.g.*, by *Miranda*) and applying the exclusionary rule would inject the courts into the minutia of police procedure and even into police budgeting and staffing decisions; and (3) the *Gerstein*/*McLaughlin* violation is already accounted for by including it as a factor in determining whether the statement was voluntarily given. *Id.* at 532-33. Our supreme court then held that, "[w]hen faced with a *Gerstein*/*McLaughlin* violation, we ask simply whether the confession was voluntary—whether the inherently coercive atmosphere of the police station was the impetus for the confession or whether it was the product of free will." *Id.* at 535.

¶ 69    Finally, our supreme court offered a few words of caution:

"[W]e are again troubled by the delay in presenting the defendant before a judge for a probable cause determination. We agree with the State and advise police that an extraordinarily long delay which itself raises the inference of police misconduct could, at some point, render any confession involuntary. See [*People v. White*, 117 Ill. 2d 194, 224 (1987)] ('a long and illegal detention may in itself impel the defendant to confess'); [*People v. Manning*, 624 N.W.2d 746, 759 (Mich. Ct. App. 2000)] ('The longer the delay, the greater the probability that the confession will be held involuntary. At some point, a delay will become so long that it alone is enough to make a confession involuntary'). This case approaches, but does not cross, that line." *Id.* at 538.

¶ 70    *Willis* thus teaches that, where there has been a *Gerstein*/*McLaughlin* violation, the remedy is not suppression; rather, the violation will be considered as a factor in determining the voluntariness of the confession. *Id.* at 535. *Willis* did leave open the possibility that a detention could be so long as to render the confession involuntary, but this caution was couched in terms of the voluntariness determination and not as a simple bright-line or *per se* rule. *Id.* at 538.

¶ 71    Defendant notes that his detention here, 98 hours, was longer than the 73-hour preconfession detention and the 87-hour overall detention of the defendant in *Willis*. See *id.* at 522 (the defendant confessed after a 73-hour detention and was first presented to a judge 87 hours after his detention began). Defendant contends that this is precisely the case that *Willis* warned about: a case in which the detention was so long as to, by itself, render his confession involuntary. Defendant notes that the preconfession detention here was more than a third longer than that in *Willis*, and that the presentment to a judge occurred some five days after the confession, compared to 14 hours in *Willis*. This amount of time, according to defendant, is more than enough to allow us to hold that the delay alone rendered the confession involuntary, especially because *Willis* effectively set the outer limit for preconfession detention. We disagree.

¶ 72    *Gerstein* was primarily concerned with the fourth-amendment right to be free from unreasonable seizure. Thus, by requiring that an accused who had been arrested without a warrant be promptly presented for a judicial determination of probable cause, *Gerstein* sought to minimize the chances that an unlawful detention would occur. *Gerstein*, 420 U.S. at 112. Thus, *Gerstein* held that the probable-cause determination must occur either before the arrest or promptly after the arrest. *Id.* at 125.

¶ 73    Here, defendant was arrested without a warrant on the charge of attempted armed robbery in the Ma & Pa case. On May 27, 2007, a court determined that there was probable cause to arrest defendant on that charge, and it set defendant's bail at $2 million. Defendant did not post

the requisite bail. Accordingly, defendant was lawfully detained when the formal investigation of the Check 'n Go murder commenced. The overriding concern voiced in *Gerstein*, that defendant would be subject to a lengthy unlawful detention, was obviated when the judge determined that there was probable cause to hold him on the Ma & Pa offenses. At that point, defendant was lawfully detained, and he continued to be lawfully detained throughout his interrogation regarding the Check 'n Go murder.

¶ 74 Additionally, we note that neither the parties' research nor our own research has uncovered a factually similar case where the defendant was properly held on one offense but had not received a probable-cause determination on a second offense before confessing to the second offense after a lengthy interrogation. We hold that the fact that defendant had been lawfully detained serves to dispel any concerns about unlawful detention pursuant to *Gerstein* and *McLaughlin*.

¶ 75 In any event, we note again that our supreme court in *Willis* held that a *Gerstein*/*McLaughlin* violation is appropriately accounted for in the voluntariness analysis. *Willis*, 215 Ill. 2d at 535. Thus, no matter the length of the detention, we are to conduct a voluntariness analysis in regard to the defendant's confession. *Id.* Accordingly, based on the circumstances of defendant's lawful detention and the command of *Willis*, we will consider the length of defendant's preconfession detention as a factor in the voluntariness analysis.

¶ 76 Defendant argues that *Willis* and *People v. Mitchell*, 366 Ill. App. 3d 1044 (2006), suggest that the detention here was so long as to alone render the confession involuntary. Defendant's contention is misplaced. The fact that defendant was lawfully detained completely obviates the concerns raised by *Gerstein* and *McLaughlin*. Thus, attempting to shoehorn this case into a *Gerstein*/*McLaughlin* analysis is inapt. Rather, as *Willis* held, the appropriate analysis is the straightforward voluntariness analysis. *Willis*, 215 Ill. 2d at 535. Accordingly we

reject defendant's contention insofar as he is making a *Gerstein*/*McLaughlin* argument outside of the proper voluntariness analysis.

¶ 77    Defendant argues that, if we determine that *Gerstein*/*McLaughlin* concerns are not implicated in this case, we are effectively using the probable-cause determination for one offense to stand in place of the necessary probable-cause determination for another offense.  We are not. The fact that defendant was properly detained for the Ma & Pa offenses does not mean that there was probable cause to arrest him for the Check 'n Go murder.  Rather, it means that the *Gerstein*/*McLaughlin* concern, that defendant was being lawfully detained, is satisfied. Accordingly, the delay in presentment remains a factor in the voluntariness analysis, but the preconfession detention attributed to the Check 'n Go murder does not raise any improper seizure or detention concern of constitutional dimension other than the impact on the voluntariness of defendant's statement.

¶ 78    We now consider the trial court's ruling that defendant voluntarily gave his confession in this case.  To determine whether a defendant's confession was voluntary, we consider the totality of the circumstances.  *Id.* at 536.  Among the factors we consider are the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and the interrogation; the duration of the interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention.  *Id.*  As we noted above, the trial court's factual findings will not be disturbed unless they are against the manifest weight of the evidence; the trial court's ultimate determination of whether the confession was voluntary is reviewed *de novo*, as that presents the legal question of whether the applicable law was properly applied to the historical facts.  *Absher*, 242 Ill. 2d at 82.  With these principles in mind, we consider whether defendant's confession was voluntary under the totality of the circumstances.

¶ 79    Defendant was 23 years of age at the time of his arrest.  He was of at least average intelligence, and he was in good physical condition.  Defendant also had significant prior experience with the criminal justice system: defendant had a Wisconsin conviction of receiving stolen property, and he had three Illinois felony convictions of receiving stolen property and had been incarcerated in the Illinois Department of Corrections on a four-year prison term beginning in June 2004.  We conclude that these factors squarely cut in favor of the voluntariness of defendant's statement.

¶ 80    Defendant was repeatedly advised of his *Miranda* rights.  At the outset of the Check 'n Go interrogation, on May 27, defendant was *Mirandized*.  Defendant eventually invoked his right to consult with an attorney, and this request was promptly (albeit not immediately) honored.  The interrogation did substantively terminate upon defendant's request; the remaining discussion consisted of defendant asking what the next steps would be.  Defendant was not interrogated again until May 29, when he asked to speak to Detective Schletz.  At that time, defendant was again advised of his *Miranda* rights and he maintained that he wished to speak with the police.  When the May 29 interrogation adjourned, Schletz and defendant agreed to continue the interview the next day.

¶ 81    Before noon on May 30, defendant was once again advised of his *Miranda* rights.  This session culminated with defendant confessing to shooting Morrell.  Based on these circumstances, we determine that defendant was adequately and repeatedly advised of his rights to remain silent and to consult with an attorney.  Moreover, the questioning about the Check 'n Go murder ceased when defendant invoked those rights, and defendant's desire to remain silent was respected over the course of the ensuing days, until defendant told the evidence technician that he wished to speak to Schletz. The termination of the interrogation at defendant's request only serves to emphasize his understanding of his rights and the fact that the police would

scrupulously observe and honor his decision to take advantage of their protection. Accordingly, we conclude that this factor cuts in favor of the voluntariness of defendant's confession.

¶ 82    Next, defendant did not complain that he had been subjected to either mental or physical abuse. This is borne out by the recordings of the interrogation. There is no indication in the record that the police engaged in any improper physical or mental coercion of defendant. This factor too cuts in favor of the voluntariness of the confession.

¶ 83    The length-of-the-interrogation factor is less straightforward than the preceding factors. Defendant was actively interrogated over the course of three days during a four-day span (not including the interrogation about the Ma & Pa offenses). On Sunday, May 27, defendant was interrogated for about an hour. The interrogation stopped when defendant invoked his right to consult with an attorney. At about 5 p.m., on Tuesday, May 29, defendant reinitiated questioning. Defendant received *Miranda* warnings and then was given food. At about 6:30 p.m., questioning resumed in earnest. At about 9 p.m., questioning was interrupted for about five minutes, as Schletz was given the information that there had been a ballistic match between the spent bullet from the Check 'n Go murder and the gun recovered at the Ma & Pa. Questioning resumed for about another hour, and, at about 10 p.m., defendant was given water and they took a half-hour break. At about 10:30 p.m., questioning was terminated for the day, with defendant agreeing to finish it up the next day. Thus, on May 29, defendant was questioned for about 3½ hours over a span of about 5 hours.

¶ 84    On May 30, questioning resumed. From about noon to about 2:15 p.m., defendant was questioned. At about 2:15 p.m., Schletz gave defendant coffee and they took a half-hour break. From about 2:40 p.m. to about 4 p.m., questioning again continued. At about 4 p.m., another break was taken, with Schletz briefly checking on defendant at about 4:40 p.m. and resuming questioning just before 5 p.m. From about 5 p.m. to about 5:30 p.m., defendant gave his oral

inculpatory statement and elaborated about the events at the Check 'n Go. At about 5:30 p.m., defendant was given food and a 45-minute break. Questioning resumed at about 6:15 p.m. and continued for another 45 minutes. After 7 p.m., defendant's statement was typed up and read to him. Thus, on May 30, defendant was questioned for about five hours over a span of about seven hours.

¶ 85    Thus, during the active interrogation, defendant was questioned for about 9½ hours over the course of about 13 hours. Defendant was given breaks, food, and drink during the course of the questioning. Defendant had sessions of questioning that lasted as long as 3½ hours without a break. In *Mitchell*, the defendant was interrogated for about 10½ hours in total, with the longest session lasting about 5 hours (apparently including "occasional breaks"). *Mitchell*, 366 Ill. App. 3d at 1045-48. Here, defendant was questioned for fewer hours in briefer sessions. Moreover, in this case, all of the questioning was recorded. Based on these circumstances, we conclude that this factor is relatively neutral, perhaps cutting slightly in favor of the voluntariness of defendant's confession.

¶ 86    The final factor is the length and legality of the detention. As we have noted above, defendant was validly in custody throughout the entirety of his detention, owing to the arrest warrant issued in the Ma & Pa case. Thus, the impact of the length of defendant's detention is significantly mitigated by the overarching legality of defendant's detention. For that reason, we conclude that this factor only slightly cuts against the voluntariness of defendant's confession.

¶ 87    Considering the totality of the circumstances, we conclude that defendant's confession was voluntary. While, for example, a similarly lengthy interrogation was found to render the defendant's confession involuntary in *Mitchell*, the circumstances there were significantly different. In *Mitchell*, the defendant had a lengthy detention before any determination was made of the propriety of the detention. Additionally, the defendant steadfastly denied his involvement

over and over, yet the interrogation continued without giving credence to the defendant's denials. Further, the defendant was in constant pain after he had injured himself during the questioning. *Id.* at 1055. Here, by contrast, defendant professed that he wished to help the investigation in whatever way he could. He was in good physical and mental condition. His rights had been scrupulously observed during the course of the questioning, and he had received frequent breaks and briefer questioning sessions. Importantly, here, defendant was lawfully detained at all times during the questioning. Based on these circumstances, *Mitchell* is readily distinguishable. Accordingly, we hold that the trial court correctly determined that defendant's confession was voluntary.

¶ 88 Defendant argues that, from about 9 p.m. on May 29, the police had probable cause to arrest defendant because the police had received the firearm expert's opinion that the spent bullet found at the Check 'n Go was fired from the gun that was recovered outside of the Ma & Pa and that defendant admitted to using in the Ma & Pa offenses. While this is true, the impact of the State's failure to follow through and obtain an arrest warrant or other judicial determination of probable cause was obviated by the fact that defendant was already being lawfully detained, and the fact that a warrant was not obtained in the Check 'n Go case has no impact on the voluntariness analysis. We emphasize that, while the determination of probable cause in the Ma & Pa case does not stand in for a probable-cause determination in the Check 'n Go case, the existence of probable cause in the Ma & Pa case does render defendant's detention lawful. Thus, the concern in *Gerstein*/*McLaughlin*, that a defendant would be held unlawfully, is not present in this case, due to the fact that defendant was under lawful detention at all times during the interrogation related to the Check 'n Go case. Accordingly, we reject defendant's contention.

¶ 89 Based on the foregoing, we conclude that there was no error in the trial court's decision to deny defendant's motion to suppress. Because the trial court did not err, there is no plain

error. *Walker*, 232 Ill. 2d at 124. Accordingly, we must honor defendant's procedural default of the issue of the involuntariness of his confession due to a *Gerstein*/*McLaughlin* violation. *Id.* As defendant offers no other grounds on appeal to support his argument, we need not further address the involuntariness issue, and we affirm the judgment of the trial court in case No. 07-CF-2016.

¶ 90                              B. Propriety of the Public-Defender Fee

¶ 91    Defendant next contends that the trial court erred in imposing a public-defender fee in the Ma & Pa case. Section 113-3.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/113-3.1 (West 2014)) provides that the defendant may be required to pay a "reasonable sum" to defray the cost of an appointed public defender. In order to impose this fee, however, the trial court is required to hold a hearing to determine the defendant's financial circumstances. 725 ILCS 5/113-3.1(a) (West 2014). As defendant's contention involves the interpretation and application of this statute, our review is *de novo*. *People v. Daniels*, 2015 IL App (2d) 130517, ¶ 24.

¶ 92    Defendant argues that the trial court held no hearing on defendant's financial circumstances within the time allowed by section 113-3.1. The State concedes that no hearing was held. Our review of the record is in accord; it does not contain any indication that the trial court considered defendant's financial circumstances in imposing the public-defender fee.

¶ 93    We note that defendant did not raise this issue below. Even though it was not raised, forfeiture does not apply. *Id.* Accordingly, we may consider it.

¶ 94    Defendant argues that the remedy for the imposition of a public-defender fee where no hearing was held regarding the defendant's financial circumstances is to vacate the imposition of the fee. The State agrees. Where a timely yet insufficient hearing has been held, the remedy is to remand the case for a proper hearing. *People v. Somers*, 2013 IL 114054, ¶¶ 13-18. Where no

hearing whatsoever was held, the remedy is to vacate the fee. *Daniels*, 2015 IL App (2d) 130517, ¶¶ 26-30. Accordingly, we agree with defendant and the State, and we vacate the $750 public-defender fee imposed in case No. 07-CF-1890.

¶ 95                                    III. CONCLUSION

¶ 96    For the foregoing reasons, the judgment of the circuit court of Lake County in case No. 07-CF-2016 is affirmed, and the $750 public-defender fee imposed in case No. 07-CF-1890 is vacated.

¶ 97    No. 2-14-0040, Affirmed in part and vacated in part.

¶ 98    No. 2-14-0041, Affirmed.