# Illinois Official Reports

## Appellate Court

---

### *People v. Suggs*, 2020 IL App (2d) 170632

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MONTAGO E. SUGGS, Defendant-Appellant. |
| District & No. | Second District<br>Nos. 2-17-0632, 2-17-0634 cons. |
| Filed | March 17, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, Nos. 07-CF-1890, 07-CF-2016; the Hon. Daniel B. Shanes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Arianne Stein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Zenoff and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant, Montago E. Suggs, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2006)) (case No. 07-CF-2016) and of attempted murder (*id.* § 8-4, 9-1(a)(1)) and attempted armed robbery while armed with a firearm (*id.* § 8-4, 18-2(a)(2)) (case No. 07-CF-1890). Defendant was sentenced to an 80-year term of imprisonment for the murder (55 years plus the 25-year firearm add-on) consecutive to a 30-year term of imprisonment for the attempted armed robbery, which term was concurrent with a 28-year term of imprisonment for attempted murder, for an aggregate term of imprisonment of 110 years. Defendant directly appealed his convictions and aspects of his sentences. *People v. Suggs*, 2016 IL App (2d) 140040 (*Suggs I*). We affirmed the convictions and vacated the challenged fee. After *Suggs I*, defendant filed a *pro se* postconviction petition, which was summarily dismissed by the circuit court of Lake County. Defendant appeals the summary dismissal of his postconviction petition, arguing that the prohibition against imposing on juvenile offenders *de facto* life sentences should be extended to cover young-adult offenders who are no longer juveniles but who have not yet become fully mature, according to evolving neurophysiological research, or, alternatively, that his sentence did not take into account his youth and immaturity and violated the rehabilitation clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We affirm.

¶ 2                                                      I. BACKGROUND

¶ 3      The facts of this case are fully set forth in *Suggs I*. We provide a summary to orient the reader and frame the issues before us. In May 2007, defendant obtained loans from a Payday Loan in Kenosha and a Check 'n Go in Waukegan. Melinda Morrell, the victim, processed defendant's loans at the Check 'n Go. On May 21, 2007, at some time after 2 p.m., defendant returned to the Check 'n Go while Morrell was working alone. Defendant pulled out a gun and took the cash in the drawers, totaling a little over $2000. Defendant asked Morrell where the surveillance recordings were kept, and Morrell took him into the back room. Defendant ordered Morrell to lie facedown. According to defendant's statement to the police, the gun accidentally discharged and struck Morrell in the back of the head. At about 5:15 p.m., a customer entered the Check 'n Go, saw Morrell's body, and asked someone at a next-door business to call the police.

¶ 4      The police processed the scene, recovering an expended shell casing near Morrell's hip and a spent bullet on the shelf of the VCR stand. That day's surveillance tape was missing, and the "Thursday" tape was jammed in the VCR. Morrell's autopsy revealed that she had been killed by a single gunshot to the back of her head.

¶ 5      On the evening of May 21, 2007, defendant returned to the Payday Loan in Kenosha and paid off his loan from that location.

¶ 6      On May 26, 2007, shortly before 4 p.m., defendant entered the Ma & Pa Convenience Store (Ma & Pa) in Beach Park. Francisco Garcia was the clerk on duty at that time. Defendant pulled out a gun, made Garcia open the register, and forced Garcia to lie facedown near the register. Garcia heard a customer enter the store and heard defendant force the customer to lie down on the floor. Garcia heard defendant's gun click, rolled over, and saw defendant flee from the store. As defendant fled, he slipped on the wet pavement outside of the store and fell, dropping his gun. The gun was matched to the spent bullet and shell casing from the Morrell slaying.

Defendant was eventually apprehended in Wisconsin in a wooded area following a high-speed car chase.

¶ 7       Defendant initially was charged with the unsuccessful Ma & Pa robbery and was later charged with Morrell's murder. A jury trial on the Morrell murder charge resulted in defendant's convictions. Defendant then elected a stipulated bench trial on the Ma & Pa charges, and he was convicted of attempted murder and attempted armed robbery with a firearm.

¶ 8       On December 10, 2013, the trial court sentenced defendant for both the Morrell murder and the Ma & Pa offenses. At the hearing, the parties relied upon the presentence investigation report (PSI) compiled in anticipation of defendant's sentencing. The PSI reported that, while he was in custody on the instant charges, defendant had "many behavior problems," resulting in 17 referrals to maximum security. Defendant cursed at and interfered with staff; multiple referrals resulted from defendant threatening harm to other inmates or staff.

¶ 9       The PSI reported that defendant's juvenile history included an adjudication for delinquency, which ultimately led to an admission to theft pursuant to a petition to revoke his juvenile probation. While on juvenile probation, defendant experienced difficulty in complying with its terms; likewise, defendant demonstrated behavioral problems while in secure juvenile detention. Twice, before completing his juvenile parole, he was committed to the Department of Corrections.

¶ 10      Defendant's adult criminal history included convictions in Illinois and Wisconsin for possession of a stolen motor vehicle, retail theft, and receiving stolen property. Just as he had with juvenile probation, defendant experienced difficulty in completing probation for his adult offenses. Likewise, defendant exhibited behavioral issues while incarcerated as an adult.

¶ 11      The PSI also addressed defendant's mental health but indicated that defendant did not receive or participate fully in any prescribed services. The PSI also extensively discussed the impact of defendant's offenses on the victims and their families. In allocution, defendant apologized to the victim and the families, wanting them to know that he was "not a monster," but he denied responsibility for committing the offenses and expressed his determination "to prove to them that [he] was not the person who did this."

¶ 12      The State recommended that defendant receive a life term for the murder conviction and a 45-year term for the attempted murder conviction. Defense counsel argued that defendant was truly remorseful even though defendant continued to maintain his innocence. Defense counsel argued in mitigation that defendant was still young when the offenses were committed and that defendant had accepted responsibility by pleading guilty in all of his juvenile adjudications and prior adult convictions. Defense counsel did not make a recommendation about the length of the sentences.

¶ 13      The trial court prefaced its oral remarks by stating the sentencing factors it had considered. The trial court stated that it had considered all of the evidence introduced at each trial, the PSI, the victim impact statements, defendant's statement in allocution, the parties' arguments, the statutory and nonstatutory factors in mitigation and aggravation, the cost of incarceration, and defendant's rehabilitative potential.

¶ 14      The trial court expressly held that, on May 21, 2007, defendant was motivated by greed when he devised the plan to steal from the Check 'n Go, but it was more than a simple theft. The court held that defendant armed himself for the express purpose of silencing any witness,

as demonstrated by the execution-style slaying of Morrell. The court held that defendant's murder of Morrell was "cold, heartless, [and] devoid of humanity."

¶ 15    Turning to the Ma & Pa offenses, the court noted that, just five days after he murdered Morrell, defendant went to the Ma & Pa with essentially the same plan: commit a theft and murder any witnesses to silence them. The court noted the unfortunate and striking similarities between the two incidents: the employees forced to lie facedown behind the store counter, the gun pointed to their heads. Garcia survived, fortunately, because the gun did not fire. The court was especially troubled because, only five days after stealing from and murdering Morrell, defendant embarked upon the same course of conduct in attempting to steal from the Ma & Pa.

¶ 16    The trial court considered the factors in aggravation and mitigation. First, while noting that causing or threatening serious harm was inherent in the offense of murder and was not considered in connection with the sentence, the court also emphasized that, in the attempted murder, defendant's conduct "certainly did threaten serious physical harm." Next, the court considered defendant's history of juvenile delinquency and adult criminal activity. The court observed that, in 1998, defendant received juvenile adjudications for theft and possession of a stolen vehicle, the probation for which defendant could not complete successfully. Defendant graduated to adult offenses in Illinois and Wisconsin in 2001, 2003, 2004, and 2005. The court particularly noticed that defendant had been released from prison for less than a year when he committed the instant offenses.

¶ 17    The trial court also commented that its sentencing decision was designed to deter defendant and others from committing similar crimes. The court determined that defendant was not acting under any sort of provocation and there were no circumstances justifying or excusing his conduct. Finally, the trial court observed that, during his pretrial incarceration, defendant's misbehavior resulted in 17 punitive stays in the administrative segregation housing of the jail.

¶ 18    The trial court discussed several mitigating factors. The court applauded the facts that defendant was not involved with gangs and did not sell illegal drugs. The court observed that defendant received his high-school equivalency degree and that, throughout the proceedings, he retained the support of his mother and family. The court credited defendant, to the extent possible, for supporting his brother, who became a productive member of society. Last, the court noted that, when defendant was not incarcerated, he had sought and found work and that defendant proved to be a willing worker at those times.

¶ 19    The trial court pronounced that "[b]ased upon the totality of the circumstances present this is as aggravated as an attempt[ed] armed robbery as I can imagine." Regarding the attempted murder, the court observed that it was only a fortuity that Garcia was not killed or injured. Regarding Morrell's murder, the court held that defendant had committed it "to silence a witness," which was especially aggravating. The trial court discounted defendant's claims that the gun accidentally discharged during the Morrell murder based in part on his juvenile and adult criminal history. The court's expressed intent in passing sentence was for defendant to "spend the rest of [his] days in prison." The court sentenced defendant to a 30-year term of imprisonment on the attempted robbery concurrent to a 28-year term of imprisonment for the attempted murder, which was to be served at 85%. These terms were consecutive to an 80-year term for the Morrell murder, comprising a 55-year sentence plus the 25-year firearm addition, which was to be served at 100%.

¶ 20    Defendant filed a motion to reconsider the sentence. Defendant argued that the trial court misinterpreted the evidence to conclude that Morrell's killing was the result of a plan to execute

a witness rather than an accidental discharge of the weapon. Defendant argued that, because there was no "execution," the factors in aggravation and in mitigation were closely balanced and suggested that a lesser sentence would be appropriate. Finally, defendant argued that the consecutive sentencing and longer sentence for attempted armed robbery than for attempted murder were both erroneous. The trial court denied defendant's motion.

¶ 21 Defendant filed a direct appeal challenging his convictions based on the trial court's denial of his motion to suppress a custodial statement and challenging a fee assessed against him as part of his sentences. *Suggs I*, 2016 IL App (2d) 140040. We affirmed the convictions and vacated the fee. *Id.*

¶ 22 On April 13, 2017, defendant filed his *pro se* postconviction petition, arguing, *inter alia*, that his aggregate 110-year sentence violated the eighth amendment (U.S. Const., amend. VIII) and, as a *de facto* life sentence, failed to provide him a meaningful opportunity to obtain release based on maturity and rehabilitation. On July 12, 2017, the trial court summarily dismissed defendant's postconviction petition. Regarding the sentencing claim, the trial court held:

"Defendant next argues that the court erred in sentencing him to an aggregate 110 years in prison. He claims that the sentence was in essence a term of life without parole, which does not provide him with a meaningful opportunity to obtain release based on maturity and rehabilitation. Defendant alleges that his is in violation of the eighth amendment.

The eighth amendment, as applied to states through the fourteenth amendment [(U.S. Const., amend. XIV)], generally prohibits the infliction of cruel and unusual punishment for criminal offenses, as well as punishments that are disproportionate in relation to the offense committed or the status of the offender. The trial court was within the statutory limits in sentencing Defendant to 28 years for attempted murder, 30 years for attempted robbery, and 80 years for murder. Even on direct appeal a sentence shall not be reduced that is within statutory limits unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Defendant might be correct that his sentence is tantamount to a life sentence. However, the legislature determined as a matter of public policy that an actual life sentence (much less one that is tantamount to life) may be permissible for first degree murder with a firearm. Defendant fails to suggest how his sentence was greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense or how his sentence amounts to cruel and unusual punishment. See *Stacey*, 193 Ill. 2d at 210.

In addition, once again, Defendant could have litigated the alleged sentencing errors on direct appeal. See [*People v.*] *Veach*, 2017 IL 120649, ¶¶ 46-50. Claims that were or could have been presented to the reviewing court are waived and any issues that have previously been decided by a reviewing court are barred by *res judicata*. [*People v. Rissley*, 206 Ill. 2d 403, 411-12 (2003).]"

¶ 23 Defendant timely appeals the summary dismissal of his postconviction petition.

¶ 24 II. ANALYSIS

¶ 25 On appeal, defendant argues that, in light of recent scientific developments and understanding of the neurophysiological and mental development of juveniles aging into adult

maturity, the prohibition against express or *de facto* mandatory life sentences for juveniles should be extended to young adults who, while no longer juveniles, are also not fully mature adults. Defendant also contends that the trial court insufficiently considered the transient qualities of youth when imposing the *de facto* life sentence and deprived him of the opportunity to achieve rehabilitation and release.

¶ 26                              A. Principles Governing Postconviction Petitions

¶ 27        This matter is before us on the summary dismissal of defendant's postconviction petition. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a remedy to a criminal defendant whose state or federal constitutional rights were substantially violated at trial or sentencing. *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 19. As such, it is not a direct appeal from the underlying judgment but a collateral attack on it. *Id.* The defendant is constrained to raising constitutional issues that were not and could not have been raised on direct appeal. *Id.*

¶ 28        The Act contemplates a three-stage process for adjudicating a postconviction petition. *People v. Hommerson*, 2014 IL 115638, ¶ 7. In the first stage, the trial court is to determine whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2016). The court independently assesses whether the petition's allegations, liberally construed and taken as true, set forth the gist of a constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). Because the "gist" standard is a low threshold, the petition need not set forth legal arguments or include citations to legal authority. *Id.* However, if the petition has no arguable basis in either law or fact, it is subject to summary dismissal. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). As examples, a petition lacks an arguable basis in law when it presents an indisputably meritless legal theory, such as one completely contradicted by the record; a petition lacks an arguable basis in fact where it presents fanciful factual allegations, including allegations that are fantastic or delusional. *Id.* at 16-17. We review *de novo* the summary dismissal of a postconviction petition.

¶ 29                                        B. *De Facto* Life Sentence

¶ 30        Defendant argues that his aggregate sentence violates the eighth amendment because the trial court did not sufficiently account for "the transient qualities of youth and [youth's] enhanced amenability to rehabilitation." Defendant argues that emerging scientific consensus suggests that the brain continues to mature into a young adult's twenties. Defendant reasons that, because he had not yet reached full adult maturity, as he was only 23 years old when the offenses were committed, he deserved the full consideration of his youth and immaturity in his sentencing. Defendant asserts that he did not receive that consideration, rendering his sentence improper.

¶ 31        To begin to unpack defendant's argument, we turn to *People v. Buffer*, 2019 IL 122327, which considered what constitutes a *de facto* life sentence in the context of juvenile sentencing. *Buffer* recounted that the core principle informing sentencing jurisprudence is that of the old saw, the punishment should fit the crime, meaning that "criminal punishment should be graduated and proportioned both to the offender and the offense." *Id.* ¶ 15 (citing *Miller v. Alabama*, 567 U.S. 460, 469 (2012), and *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). Whether a punishment is excessive is judged not by the standards of the past, but by the evolving standards of decency and the currently prevailing standards. *Id.* Reflecting the

recently evolving standards of decency, our supreme court traced the United States Supreme Court's trio of cases prohibiting capital sentences and mandatory life sentences for juveniles (*id.* ¶ 16 (citing *Roper*, 543 U.S. at 578-79 (prohibiting capital sentences for juveniles who commit murder), *Graham v. Florida*, 560 U.S. 48, 82 (2010) (prohibiting mandatory life sentences for juveniles who commit nonhomicide offenses), and *Miller*, 567 U.S. at 489 (prohibiting mandatory life sentences for juveniles who commit murder)) and culminating in the recognition that, constitutionally speaking, juveniles are different from adults for the purpose of sentencing (*id.* ¶ 23 (citing *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 733 (2016)). This difference between juveniles and adults compels a court to account for a minor's youth before a discretionary life-without-parole sentence may be passed. *Id.* The hallmark characteristics of youth to be considered include chronological age, immaturity, impetuosity, and failure to appreciate risks and consequences, along with the influence of the youth's family and peers and the inherent incompetencies of youth, such as the inability to effectively deal with police and prosecutors or to assist his or her own attorneys in crafting a defense. *Id.* ¶ 19 (citing *Miller*, 567 U.S. at 477-78). In so doing, the sentencing court will necessarily recognize the youth's diminished culpability and greater prospects for rehabilitation. *Id.* ¶ 17.

¶ 32 Our supreme court then discussed its own implementation of the constitutional floor laid by the Supreme Court in *Roper*, *Graham*, *Miller*, and *Montgomery*. In *People v. Reyes*, 2016 IL 119271, our supreme court extended to *de facto* life sentences the prohibition against juvenile life sentences. *Buffer*, 2019 IL 122327, ¶ 26. In *People v. Holman*, 2017 IL 120655, ¶ 38, our supreme court highlighted that the Supreme Court's discussions in these cases, especially *Miller*, was broader than the actual holdings. *Buffer*, 2019 IL 122327, ¶ 25. Based on the expansive language, our supreme court held in *Holman* that *all* juvenile life sentences, mandatory or discretionary, were unconstitutional unless the trial court considered the offender's youth and its attendant characteristics. *Id.* (citing *Holman*, 2017 IL 120655, ¶ 40).

¶ 33 Defendant argues that the trend, legally and scientifically, is to give the signature qualities of youth additional weight in sentencing. Additionally, defendant suggests that the legal definition of "youth" is expanding to cover increasingly older individuals. We agree that this is occurring. However, defendant faces the significant hurdle that no court has yet applied the *Roper-Graham-Miller* trio to an offender of defendant's age, 23 years at the time of the offense. Indeed, the cases cited by defendant involved offenders aged 19 years or younger. *E.g.*, *People v. House*, 2019 IL App (1st) 110580-B (the defendant was 18 years and three months at the time of the offense); *Holman*, 2017 IL 120655 (the defendant was 17 years at the time of the offense); *People v. Patterson*, 2014 IL 115102 (the defendant was 15 years at the time of the offense); *Cruz v. United States*, No. 11-CV-787, 2018 WL 1541898 (D. Conn. Mar. 3, 2018) (the defendant was 18 years and 20 weeks at the time of the offense). In *Cruz*, for example, the court held that there was no compelling reason to draw the line at 18 years while excluding from consideration the youth of an offender aged just over 18 years. *Cruz*, 2018 WL 1541848, at *25. The court based its holding on a thorough review of the national consensus, the legal trends, and the scientific evidence presented in that case. In particular, the scientific evidence supported grouping together those in late adolescence, from ages 18 to 21, and those individuals who continued to exhibit the signature qualities of youth. *Id.* at *24. The *Cruz* court, however, refused to extend the line of special consideration of youth beyond the defendant in that case, notwithstanding the scientific expert drawing the line at age 21. *Id.*

¶ 34 We also note that, to some extent, our legislature has endorsed the special consideration of the youth of offenders older than 18 years. In particular, the Illinois General Assembly passed Public Act 100-1182, which provided that an offender under 21 years of age at the time of the commission of certain offenses would be eligible for parole review. See Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110). Specifically, a qualifying offender under the age of 21 who committed a first degree murder would be eligible for parole review after serving 20 years of the sentence, but offenders serving natural-life sentences are excluded. *Id.* In *House*, 2019 IL App (1st) 110580-B, ¶ 62, the court took notice of the new provision as an illustration of the "recent trends discussed in [its] analysis that an individual under 21 years of age should receive consideration for their age and maturity level when receiving harsh sentences."

¶ 35 To defendant's point, then, society has drawn lines at ages 18 and 21 for various purposes. Defendant cannot point to any line, societal, legal, or penological, that is older than 21 years. Indeed, in *Cruz*, some research suggested that some types of neurological maturation continue until around 25 years for specific qualities like risk-taking behaviors and submission to peer pressure, and the scientific expert was willing to extend the line to 21 years, but he did not equate the behaviors of late adolescents (aged 18 to 21) to those of young adults (older than 21 years). *Cruz*, 2018 WL 1541898, at *24. In short, defendant points to no authority that has so broadly interpreted the *Roper*, *Graham*, *Miller*, and *Montgomery* line of cases, and our own research has uncovered none. While it seems but a short step to extend the *Roper*, *Graham*, *Miller*, and *Montgomery* line of cases to an 18-year-old offender, it is a much greater leap to extend it to a 21-year-old, and an even greater leap to apply it to a 23-year-old, such as defendant.

¶ 36 Defendant seeks to invoke the signature qualities of youth to mitigate his sentence in this case. However, the trial court expressly found that few if any of those signature qualities were evident in the planning and execution of the offenses here.[1] The crimes were perpetrated alone, and defendant does not claim susceptibility to peer pressure. The crimes were carefully planned to minimize the chance that defendant would encounter more than one or two individuals. From the evidence, the court inferred that defendant executed Morrell to remove a possible witness, and the inference is supported by the effectively identical crime that occurred a scant five days later at the convenience store. The lives of the clerk and probably the customer were saved only by the fortuity that defendant's weapon did not fire. Thus, these offenses were not simply opportunistic and impetuous—rather, they were carefully planned and designed to avoid and remove any witnesses or other evidence leading to the perpetrator. This planning, as repugnant defendant's calculus may have been, is at odds with a young person's tendency not to appreciate the risks and consequences; rather, the plans expressly contemplated those risks and consequences. Specifically, we note that defendant approached Morrell's office in a manner to avoid the surveillance cameras, and he removed the surveillance recording after accomplishing his criminal objective. All of this points to a sophisticated plan and execution that is inconsistent with the signature qualities of youth. Even if we had the unfettered liberty to vastly expand the reach of *Roper*, *Graham*, *Miller*, and *Montgomery*, there is little in the record to suggest that defendant, who was 23 years of age at the time of the offense, actually

---

[1]Factual determinations, we hasten to add, that are supported by ample evidence in the record and that are not against the manifest weight of the evidence.

labored under the signature qualities of youth that require juveniles to be treated differently from adults. In other words, the record contains ample evidence that defendant exhibited maturity in conceiving and performing the vicious and reprehensible offenses for which he was convicted. The evidence does not support treating defendant as a juvenile instead of as an adult. Thus, even an as-applied challenge to his sentence under *Roper*, *Graham*, *Miller*, and *Montgomery* fails.

¶ 37        We note that defendant's argument is neither illogical nor incoherent. There is support for extending the treatment of juveniles to young adults because neurological development seems to continue into the mid-twenties. See Kevin J. Holt, *The Inbetweeners: Standardizing Juvenileness and Recognizing Emerging Adulthood for Sentencing Purposes After Miller*, 92 Wash. U. L. Rev. 1393, 1410-17 (2015) (discussing the scientific underpinnings of *Roper*, *Graham*, *Miller*, and *Montgomery* and implications for implementing a coherent sentencing rationale to account for current understanding of neurological development). Nevertheless, neither defendant nor this court has uncovered a case extending the rationale of *Roper*, *Graham*, *Miller*, and *Montgomery* to a 21-year-old, let alone someone older than that. We must follow our supreme court's decisions, which are binding on all lower courts; it is up to the supreme court to modify those decisions. *People v. Artis*, 232 Ill. 2d 156, 164 (2009). We reject defendant's contention that his sentence did not comport with constitutional strictures.

¶ 38                                C. Rehabilitation Clause

¶ 39        Defendant next argues that his sentence violated the rehabilitation clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), by failing to account for the transient qualities of youth and a young person's enhanced amenability to rehabilitation. Defendant argues that the trends noted above in our discussion of *Roper*, *Graham*, *Miller*, and *Montgomery* should inform our interpretation of our state constitution's rehabilitation clause and, accordingly, the trial court was obligated to consider his prospects for rehabilitation through the *Miller* lens. For the reasons discussed above, *Roper*, *Graham*, *Miller*, and *Montgomery* do not apply to defendant, who is beyond the 21-year-old cutoff suggested in some of the cases discussed above.

¶ 40        Stripped, then, of the gloss of *Roper*, *Graham*, *Miller*, and *Montgomery*, defendant's argument is little more than a contention that the trial court did not properly weigh his rehabilitative potential. Such an argument should have been raised on direct appeal, but it was not. It is, therefore, forfeited. *People v. Ligon*, 239 Ill. 2d 94, 103 (2010) (in a postconviction proceeding, issues addressed on direct appeal are barred by *res judicata*, and issues that could have been considered on direct appeal are procedurally defaulted). Moreover, defendant does not contend in his postconviction petition that his attorney on direct appeal was ineffective for failing to raise the issue and cannot evade the procedural default on that ground. *People v. Jones*, 213 Ill. 2d 498, 508 (2004) (failure to include an issue in a postconviction petition results in forfeiture that the appellate court is unable to excuse).

¶ 41        Finally, to the extent that defendant's challenge may be addressed on the merits, it is well established that a sentence that is within the statutory limits for the offense will not be disturbed absent an abuse of discretion, meaning that the sentence is greatly at variance with the spirit or purpose of the law or is manifestly disproportionate to the crime. *People v. Peltz*, 2019 IL App (2d) 170465, ¶ 29. Defendant challenges only the weight given to his youth and rehabilitative potential. Defendant's youth does not support a shorter sentence, as discussed above.

Rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010). Here, the trial court held that Morrell's slaying was "cold, heartless, [and] devoid of humanity," implying that defendant lacked rehabilitative potential, which assessment was not against the manifest weight of the evidence. Indeed, beyond his age and a young person's general amenability to rehabilitation, defendant points to nothing in the record to suggest that he has rehabilitative potential. Further, defendant was disciplined for numerous offenses at the jail while awaiting trial and sentencing. Defendant had shown himself unable to successfully complete his probation services both as a juvenile and as an adult. Accordingly, we conclude that the trial court did not abuse its discretion in evaluating his rehabilitative potential.

¶ 42        Accordingly, we reject defendant's contention on this point.

¶ 43                                III. CONCLUSION

¶ 44        For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 45        Affirmed.