2020 IL App (2d) 170526-U
No. 2-17-0526
Order filed November 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-2486 |
| MARTELL L. BUCKLEY, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly dismissed defendant's postconviction petition at the first stage of review as patently frivolous and without merit.

¶ 2    Defendant, Martell L. Buckley, appeals the first-stage dismissal of his postconviction petition.  On appeal, defendant, proceeding *pro se*, argues that the circuit court of Winnebago County erred in summarily dismissing his postconviction petition.  We affirm.

¶ 3                                  I. BACKGROUND

¶ 4    We summarize the relevant facts in the record.  On May 22, 2012, Duane Buchanan was shot and killed at a BP gas station in Rockford.  The gas station's surveillance system captured the

overall incident, but the quality of the footage was poor, making it difficult to determine which of the people captured in the footage possessed firearms and which people shot firearms.

¶ 5    Some months after the event, defendant was questioned by the police.  According to Detective John Eissens of the Rockford police department, defendant knew the victim, Buchanan. Defendant admitted to Eissens that he was at the gas station and engaged in a fistfight with Buchanan.  Defendant also admitted that he, Rico Jefferson, and Russell Jefferson had ridden to the gas station in a van driven by Dominique Patterson.[1]  Defendant told Eissens that, after seeing Buchanan go into the gas station store, he waited for him outside.  As soon as Buchanan exited, defendant initiated a fistfight with him.  Defendant told Eissens that, as he was fighting Buchanan, he had his head down.  According to defendant, in the midst of the fight and upon hearing gunshots, he fled, jumping into Patterson's van as it pulled away.

¶ 6    Dewaun Glover, a middle-schooler at the time of the offense, was 15 and in juvenile custody when he testified at trial.  Glover testified that he was walking home from a friend's house when he noticed a commotion at the gas station.  Glover observed four or five black men near a van and another black man standing near a black car.  The group of men were arguing with the man by the car.  Glover testified that, after he heard gunshots, he saw the man near the black car fall to the ground.  The van left the station.  Glover testified that, after the shooting, he continued walking towards the gas station and recognized the man who fell on the ground, who he knew by

---

[1] In separate proceedings, Rico and Russell Jefferson were also tried and convicted of Buchanan's murder.

his street nickname. On cross-examination, the defense brought out that Glover did not know who at the gas station was shooting the guns, and Glover denied knowing anyone named "Manny."

¶ 7    During his testimony, Glover stated that he did not remember speaking with Officer Jamie Martin or what they talked about the day following the shooting. Testifying for defendant, however, Officer Martin testified that, on May 23, 2012, the day following the shooting, she interviewed Glover as part of her duties as liaison officer assigned to Glover's middle school. Martin testified that Glover told her that he was down the street from the gas station when he saw a white van pull in. There were five older black men in the van, all wearing dark hoodies with the hoods pulled up. All five men got out of the van and argued with Buchanan and the front passenger of the van pulled a gun and shot Buchanan with it and continued to shoot at Buchanan while he was on the ground. Martin testified that Glover told her that another car pulled up and a black man Glover knew as "Manny" got out. Glover believed that Manny was a friend of Buchanan's. According to Glover, the shooter also began shooting at Manny. The men got into the van and drove away toward Glover; Manny got into his car and drove away in the opposite direction.

¶ 8    Kadijah Bailey testified that she was driving in the parking lot of a strip mall adjacent to the gas station when the shooting occurred. Bailey testified that, after she heard gunshots, she saw a lot of people running around at the gas station. She observed a man lying on the ground in front of a black car. Bailey testified that she saw a black man run around the front of the black car and get into a van. Bailey testified that the man on the ground in front of the black car was moving his head before the other man ran in front of the black car. Bailey testified that, in a written statement produced at the behest of the police, she related that the man running in front of the black car shot the man lying on the ground. Bailey testified that the man on the ground stopped moving his head

as the man ran past, leading her to reason that the running man had shot him. In her trial testimony, however, Bailey admitted that she did not actually see the running man holding a gun or shoot anyone. Bailey testified that her contradictory statement in her written account to the police was the result of an assumption based on her observation that the man on the ground's head dropped as the other man ran past as he was heading to the van. Bailey admitted that she did not know how important the details of the written statement would be when she signed the statement, which had been written out by a police officer based on their discussion. Portions of Bailey's written statement were admitted into evidence during the State's case.

¶ 9      Bailey testified that, while she did not see the running man holding a gun, she did observe another man holding a gun at the gas station. Bailey testified that the man holding the gun had dreadlocks and wore a white t-shirt. She observed the man with dreadlocks running away from the black car in the opposite direction from the running man. Bailey testified that, later, she learned the name of the man with dreadlocks was Demario. Bailey testified that Demario was shooting his gun as he was running away. The surveillance footage shows a black man exit the passenger side of Buchanan's car and run along the route Bailey described.

¶ 10     Robert Saunders testified that, on the date of the shooting, he was driving his Honda Odyssey and stopped at the gas station to fill up on gas. Saunders testified that he heard several loud sounds that he initially believed to be fireworks. Saunders testified that he observed a young black man wearing a white t-shirt and red baseball cap run past his van with a handgun in his right hand. He was behind the man with the gun, and the man was running away from Saunders, so Saunders saw the man from the back as he ran.

¶ 11    The State published surveillance footage from the interior and exterior of the gas station, showing, respectively, the store and the pumps. The interior footage showed Buchanan's car parking in between the store itself and the van defendant arrived in, which was parked at the first gas pump. Buchanan and defendant are seen entering the store. Defendant was wearing a white shirt with a dark pattern on the shoulders; Buchanan is wearing dark clothing. Defendant is seen leaving the store shortly before Buchanan. The exterior footage shows defendant pacing in front of the store, looking into the car Buchanan arrived in. Several occupants of the van in which defendant arrived are seen standing outside of it for about 10 minutes. Shortly after Buchanan exits the store, defendant punches him in the face, beginning the fistfight.

¶ 12    After the fistfight begins, two of the men, who were standing by the van in which defendant arrived, approach defendant and Buchanan as they fight. One man, who is also wearing a white shirt, extends an arm toward Buchanan. That man's left hand appears to hold an object shaped like a firearm. The resolution of the video, however, is too poor to clearly discern what that man is actually doing. At almost the same time, "Demario" exits the dark car, and the fistfight appears to be over. Defendant is seen running towards the street-side of the store and Buchanan is seen running in the opposite direction, towards the front of his car, the dark car. At this point, everyone begins to run, and it appears that shots are being fired. Buchanan falls in front of the dark car; "Demario" is seen running away from the dark car, his hand extended behind him as he runs. Defendant is seen running and at one point, his arm appears to be extended toward the dark car. The cars drive off.

¶ 13    At the scene, the police found numerous shell casings from at least three calibers of ammunition. Near Saunders's minivan and the van in which defendant arrived, .40 caliber casings

were found. Along a line starting on the passenger side of Buchanan's car (the dark car), 9 mm casings were found. Three spent .380 caliber casings were found near the line of 9 mm casings. On the ground near Buchanan's car, police also recovered a hat and necklace that defendant had been wearing.

¶ 14    Following the State's case-in-chief, defendant moved for a directed verdict. The trial court granted defendant's motion on the felony murder based on armed robbery, finding that no evidence had been adduced relating to any type of robbery, but denied as to the remaining counts.

¶ 15    In defendant's case, Robert Faulkner, an investigator, testified that he had taken Bailey's statement before trial. Faulkner testified that, in that statement, Bailey partially recanted her statement to the police, telling him that she did not actually see anyone shoot Buchanan as he lay on the ground.

¶ 16    At the conclusion of the evidence, the jury was instructed on both accountability and proximate-cause felony murder. The jury acquitted defendant of intentional murder. The jury also answered a special interrogatory, finding that defendant had not personally discharged a firearm. The jury found defendant guilty of knowing murder and guilty of felony murder based the underlying offenses of mob action and aggravated discharge of a firearm at a person. The trial court merged the three offenses and expressly sentenced defendant on the knowing-murder count, sentencing defendant to a 37-year term of imprisonment.

¶ 17    On direct appeal, defendant challenged the sufficiency of the evidence, arguing that, because the State presented no proof as to who shot Buchanan and presented no evidence that defendant was accountable for the unknown shooter's actions, he had not been proved guilty beyond a reasonable doubt. Defendant also challenged several errors in the jury instruction.

Specifically, defendant argued that it was reversible error to provide separate definitions and issues instruction for each of the separate counts charging the various theories of murder. Defendant also challenged giving the jury Illinois Pattern Jury Instructions, Criminal, No. 7.02X (4th ed. 2000) (hereinafter IPI Criminal 4th No. 7.02X), which states that the jury may not find the defendant guilty of felony murder but acquit the defendant of the underlying felony. Defendant also challenged giving the jury the definition of proximate cause, Illinois Pattern Jury Instructions, Criminal, No. 4.24 (4th ed. Supp. 2011), which, according to the comments, should not be given in homicide cases.

¶ 18    This court rejected defendant's challenge to the sufficiency of the evidence. We held that the "jury could have reasonably identified one or more individuals in the video as the shooter(s) and also [could have] reasonably concluded that the shooter(s) shared a criminal design with defendant." *People v. Buckley*, 2016 IL App (2d) 140420, ¶ 56. We also held that we lacked authority to address the defendant's challenges to IPI Criminal Nos. 4.24 and 7.02X because the instructions related to the felony-murder counts, and those counts had been merged into the knowing-murder count and no sentence had been passed upon them. *Id.* ¶¶ 79, 82. We also rejected defendant's contention that the multiple definitions and issues instructions instead of a single instruction for all the counts deviated from the substantive law and misled the jury. *Id.* ¶ 77.

¶ 19    On March 18, 2017, defendant filed a *pro se* postconviction petition. In the petition, defendant raised six claims: (1) a claim of actual innocence (arguing that the evidence adduced at trial was insufficient to find him guilty beyond a reasonable doubt); (2) ineffective assistance of trial counsel (failure to investigate or examine Demario Brown as a witness or to develop the

theory that Brown was actually the shooter); (3) errors in instructing the jury (recapitulating the instructional errors claimed on direct appeal); (4) ineffective assistance of trial and appellate counsel (failing to raise the errors in instructing the jury); (5) ineffective assistance of appellate counsel (failing to challenge, on direct appeal, the State's use of leading questions in the examination of Glover); and (6) ineffective assistance of trial counsel (failing to impeach Glover with contradictory prior statements).

¶ 20    On June 5, 2017, the trial court dismissed defendant's postconviction petition as frivolous and patently without merit. Specifically, the court held that defendant's claim of actual innocence and claims relating to errors in jury instruction were barred by *res judicata* because the issues were raised and resolved on direct appeal. The court further held that other claims, such as an assertion that drugs found in the dark car provided a motive for the murder and prosecutorial misconduct were undeveloped and thus frivolous and patently without merit.

¶ 21    Defendant timely appeals.

¶ 22                                II. ANALYSIS

¶ 23    As noted above, defendant's postconviction petition raised six separate issues for resolution. On appeal, defendant argues that the trial court erred by summarily dismissing his postconviction petition. Defendant appears to raise a single issue on appeal: whether he "stated a meritorious claim of ineffective assistance of appellate counsel." Defendant specifically argues that counsel failed to raise instructional errors; the jury was confused by the faulty instructions; the jury's confusion led to his conviction; and appellate counsel's failure to pursue the instructional errors was unreasonable resulting in prejudice to defendant. We note that, because defendant does not provide argument on any claim from his postconviction petition but ineffective assistance of

appellate counsel, the remaining unargued claims are forfeited on appeal. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not argued are forfeited). Before addressing the issue of appellate counsel's alleged ineffective assistance, we begin with the principles guiding our review.

¶ 24                     A. Principles of Review

¶ 25    We are reviewing the summary dismissal of defendant's postconviction petition. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a remedy to a criminal defendant whose state or federal rights have been substantially violated during trial or sentencing. *People v. Suggs*, 2020 IL App (2d) 170632, ¶ 27. The Act gives a defendant a method to collaterally attack his conviction and, because a postconviction petition differs from a direct appeal, the defendant is constrained to raising constitutional issues that were not and could not have been raised on direct appeal. *Id.*

¶ 26    The Act sets forth a three-stage process for evaluating a postconviction petition. *Id.* ¶ 28. In the first stage, the trial court is to determine whether the petition is frivolous or patently without merit. *Id.* The court independently assesses whether the postconviction petition's allegations set forth the gist of a constitutional claim, and because the "gist" standard is a low threshold, the petition need not set forth legal arguments or include citations to legal authority. *Id.* With that said, however, the petition must include sufficient factual detail, provided by affidavits, records, or other evidence supporting the allegations, in order to demonstrate some objective factual basis for the allegation capable of corroboration. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). Where a petition has no arguable basis in either law or fact, it is subject to summary dismissal, and we review *de novo* the trial court's summary dismissal of a postconviction petition. *Suggs*, 2020 IL App (2d) 170632, ¶ 28.

¶ 27    An allegation of ineffective assistance in a postconviction petition is considered under the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). To prevail on an ineffective-assistance claim under *Strickland*, a defendant must show both that counsel's performance was objectively unreasonable and that the deficient performance resulted in prejudice to the defendant. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The consideration of an ineffective-assistance claim in the postconviction context adds a slight wrinkle: to survive the first stage of postconviction review, the petition must allege that (1) it is arguable that counsel's performance fell below an objective standard of reasonableness, and (2) it is arguable that the defendant was prejudiced by the deficient performance. *Id.* With these principles in mind, we turn to defendant's claim.

¶ 28                        B. Ineffective Assistance of Counsel

¶ 29    Defendant contends that his appellate counsel was ineffective. Specifically, defendant challenges appellate counsel's failure to raise the errors in instructing the jury. This is affirmatively rebutted by the record. We note that, on direct appeal, defendant argued that the jury had been improperly instructed with separate definitions and issues instructions for each count in contravention of the committee comments (*Buckley*, 2016 IL App (2d) 140420-U, ¶¶ 76-77), and he appears to argue in this appeal that the jury was confused by the separate definitions and issues instructions. Because the issue was raised on direct appeal and resolved against defendant, there is no merit and defendant cannot have been prejudiced by appellate counsel's action. *People v. Borizov*, 2019 IL App (2d) 170004, ¶ 14 (no prejudice accrues from a nonmeritorious claim on direct appeal). Moreover, because appellate counsel raised the claim on direct appeal, it is barred from consideration in this appeal by *res judicata*. *People v. Davis*, 2014 IL 115595, ¶ 13. Further,

where *res judicata* or forfeiture bars defendant from obtaining relief on a claim, that claim is necessarily frivolous and patently without merit. *People v. Blair*, 215 Ill. 2d 427, 445 (2005). Accordingly, defendant's ineffectiveness claim regarding the multiple definitions and issues instructions cannot stand.

¶ 30    Defendant contends appellate counsel was ineffective regarding the erroneous provision of IPI Criminal 4th No. 4.24. This issue was raised on direct appeal (*Buckley*, 2016 IL App (2d) 140420-U, ¶¶ 80-83), and defendant's argument in this appeal seems to recapitulate the argument rejected on direct appeal. Accordingly, the claim is barred by *res judicata* (*Davis*, 2014 IL 115595, ¶ 13), is not prejudicial (*Borizov*, 2019 IL App (2d) 170004, ¶ 14), and thus, is frivolous and patently without merit (*Blair*, 215 Ill. 2d at 445).

¶ 31    Defendant also argues that appellate counsel was ineffective for failing to develop the argument that the erroneous instructions with IPI Criminal 4th No. 4.24 confused the jury and only raised this contention at oral argument. According to defendant, had appellate counsel presented this argument before oral argument, it would not have been forfeited (see *Buckley*, 2016 IL App (2d) 140420-U, ¶ 84 (holding forfeited appellate counsel's "broader claim that IPI Criminal 4th No. 4.24's definition of proximate cause could have confused the jury with respect to *any* charge of which causation was an element," because it was raised for the first time at oral argument)), and it is arguable that defendant was convicted as a result of the jury confusion. However, defendant's argument in this appeal fairly recapitulates the unsuccessful argument presented on direct appeal. See *id.* ¶ 83 (quoting defendant's argument which tracks the argument raised in this appeal). As such, the claim is barred by *res judicata* (*Davis*, 2014 IL 115595, ¶ 13), is not prejudicial (*Borizov*, 2019 IL App (2d) 170004, ¶ 14), and thus, is frivolous and patently without merit (*Blair*, 215 Ill.

2d at 445).

¶ 32    Finally, defendant arguably challenges the sufficiency of the evidence, arguing that, with regard to the State's accountability theory, "[a]t trial, there was no evidence presented that proved [defendant] committed any element of the knowing murder count." To the extent that presents a claim different than his ineffective-assistance claim, it fails. On direct appeal, defendant argued that "the State presented no evidence that he intended to promote or facilitate another's crime against Buchanan." *Buckley*, 2016 IL App (2d) 140420, ¶ 43. Defendant's contention in this appeal is the same contention that was advanced in the direct appeal. It is, therefore, barred by *res judicata*. *Davis*, 2014 IL 115595, ¶ 13.

¶ 33                                III. CONCLUSION

¶ 34    For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

¶ 35    Affirmed.