**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200423-U

Order filed August 22, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0423 Circuit No. 09-CF-2200 |
| JASON M. GONZALEZ, | ) ) ) | Honorable Edward A. Burmila Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Holdridge and McDade concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court did not err in dismissing defendant's postconviction petition at the first stage.

¶ 2    Defendant, Jason M. Gonzalez, appeals from the first-stage dismissal of his postconviction petition. Defendant argues that the Will County circuit court erred in dismissing his petition because he presented the gist of a constitutional violation that his sentence violates the proportionate penalties clause of the Illinois Constitution. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged with three counts of first degree murder (720 ILCS 5/9-1(a)(1),

(a)(2), (a)(3) (West 2008)), two counts of home invasion (*id.* §§ 12-11(a)(3), (a)(5)), residential

burglary (*id.* § 19-3(a) (West 2008)), and unlawful possession of a stolen motor vehicle (625

ILCS 5/4-103(a)(1) (West 2008)), stemming from the September 17, 2009, murder of Lance

Goebel. Defendant was 23 years old at the time of the offenses.

¶ 5        Defendant waived his right to counsel and represented himself at jury trial. The evidence

at trial revealed that Lance cared for two developmentally disabled men who lived in his

basement. Defendant was Lance's nephew. Defendant lived with Lance from 2008 to late June or

early July 2009, at which time, defendant was told to leave. Lance eventually banned defendant

from the house and defendant went to live at his mother's apartment.

¶ 6        In the weeks leading up to the murder, defendant sold his personal property and began to

stockpile various items, including canned goods and toothpaste, which he packed into bags and

stored at his mother's apartment. On the morning of September 17, 2009, defendant shaved his

head and facial hair. Surveillance video showed defendant loading his bags into his mother's

vehicle. Defendant was observed outside Lance's home that day. Lance's vehicle was missing

from his garage after his murder. It was eventually located in an empty parking lot. Witnesses

observed defendant driving Lance's vehicle that day.

¶ 7        Lance was attacked in his living room and sustained 14 separate gunshot wounds to his

face, head, neck, chest, arms, and body. Bullets were retrieved from Lance's body and inside the

house. These bullets matched 9-millimeter bullets fired from defendant's pistol. One bullet

pierced the living room floor and entered the basement where the two developmentally disabled

men resided. Defendant would have known these men were in the basement at the time of the murder as he had lived with them for a year and had provided care to them.

¶ 8    Police arrested defendant on September 22, 2009, in his mother's vehicle. The license plates registered to the vehicle had been removed and a different license plate had been affixed to the vehicle. A search of the vehicle revealed a stockpile of survival items: a portable global positioning system, a gas can, a fishing pole, a backpack, water bottles, a flashlight, personal hygiene products, a trench shovel, a first aid kit, an inflatable raft, a portable shower, and a duffel bag filled with canned goods along with defendant's personal items, clothing, and new prepaid cell phone.

¶ 9    While the trial was ongoing, the parties reached a partially negotiated plea agreement. The State filed a new information alleging one count of first degree murder. This charge contained no reference to the use of firearms, removing the possibility of any mandatory firearm sentencing add-on. Defendant entered an open plea of guilty to first degree murder as alleged in the newly filed information.

¶ 10    Defendant continued to represent himself at sentencing. At the hearing, the court heard the following evidence which was introduced by way of video and written statements, and the presentence investigation report (PSI).

¶ 11    Defendant had no prior criminal record and no history of substance abuse. Defendant had dropped out of high school but had obtained a general education diploma (GED) and completed 16 to 20 credit hours at Joliet Junior College. His medical and mental health history were outlined in the PSI and an attached military psychological report from approximately three years prior to the murder. Defendant had served a short time in the military before receiving an honorable discharge for mental health issues, notably defendant had been diagnosed with an

"adjustment disorder with depressed mood" and a "personality disorder *** with passive-aggressive and borderline features" which, while not debilitative, would interfere with his ability to successfully complete his duties as a soldier.

¶ 12      Defendant suffered extensive abuse at the hands of his father, mother, and mother's boyfriend as a child. Defendant presented a statement from Hector Hamstra, which indicated that he knew defendant to be a nice person. Hamstra recounted that he was aware that defendant was the "object of violence by his family members" when he was younger. He witnessed defendant's mother beating him with her hands as well as insulting and degrading him verbally. Hamstra characterized defendant's father as a violent individual and a "nasty human being."

¶ 13      Defendant also presented both a written and video statement from his aunt, Rhonda Goebel. Rhonda indicated that she had witnessed defendant being struck with hands and various objects from infancy. She highlighted several incidents of violence and abuse from defendant's childhood. When defendant was several weeks old, his father removed him from his mother's arms and struck her with his vehicle. At four years old, defendant's mother threw defendant face down onto the ground and beat him with her forearm about the buttocks, back, and upper legs. Around this same time, defendant's mother punished him by putting feces into his mouth. When defendant was 10 years old, defendant's mother became upset at defendant for running through a sprinkler and refused to help him get warm and dry, allowing him to suffer through a ferris wheel ride that was so windy and cold that defendant began to shake and was visibly suffering. Defendant began to live with Rhonda at the age of 14. At that time, he suffered from fecal incontinence, which is a common result of early childhood abuse. At 15 years old, defendant returned home to his mother and her boyfriend, who also abused him. Rhonda witnessed red marks on defendant's neck from his mother's boyfriend choking him with a telephone cord.

4

Rhonda witnessed defendant's mother strike him in the face, which knocked him to the ground and broke his glasses. Rhonda took defendant to his grandmother's house and defendant lived with a series of relatives thereafter. Rhonda described defendant as empathetic, compassionate, and intelligent. He never returned any violence to his abusers and was a caring advocate for peace. She indicated that he showed great empathy when he decided to plead guilty and end the trial to avoid greater suffering for the family.

¶ 14    At the close of evidence, the State argued that defendant's conduct had caused serious harm to Lance and threatened serious harm to the two developmentally disabled men living in the basement. One bullet travelled through the floor into the basement, endangering these men. Defendant would have been aware of their presence in the basement, having lived in the home and cared for them for a time. Defendant committed the premeditated murder of a family member, in his own home. The State cited the evidence presented at trial regarding defendant's change in appearance, stockpiling of survival items, and being discovered in his mother's car with these items five days after the incident in support of the premeditated nature of the crime. The State pointed out defendant's demeanor in court during the proceedings. He comported himself very professionally and intelligently. He was able to represent himself effectively.

¶ 15    Defendant argued that the murder was not premeditated. He indicated that his mother had shaved his head several weeks before the incident and he intended to run away but not to murder Lance. Defendant described himself as a peace advocate and nonviolent. He had never belonged to a gang or engaged in a fight. He claimed that Lance stole money from him and lied about it. Defendant went to Lance's house that day and confronted him. Defendant was angry and yelling. He explained that Lance became angry and threw a phone at him and so he "shot him for it."

¶ 16　　　　Defendant made a statement in allocution where he expressed remorse for his actions, stating: "I will forever be sorry for what I did. There's nothing I could ever do or say that will bring back Lance. For the rest of my life I will be tortured by the knowledge of what I had done to someone I love more than anyone on this earth." Further, addressing the spectators in the courtroom, defendant stated:

> "All of you, I'm sorry, every single one of you, because you are the people that I have hurt. Every single one in this audience. And to know what I have caused, to know that pain, to know that I have spread that poison inside of me to all of you makes me sick."

¶ 17　　　　When pronouncing the sentence, the court discussed the various factors and evidence at length, considering both defendant's arguments regarding the lack of premeditation and defendant's assertion that Lance threw a phone at him. The court found that neither the maximum nor the minimum sentence was appropriate and sentenced defendant to 45 years' imprisonment. Defendant filed a motion to withdraw his guilty plea and a motion to reconsider his sentence, both of which were eventually withdrawn. Defendant did not file a direct appeal.

¶ 18　　　　On July 20, 2020, defendant filed a postconviction petition alleging that his 45-year sentence violated the proportionate penalties clause of the Illinois Constitution. See *Miller v. Alabama*, 567 U.S. 460 (2012); *People v. Buffer*, 2019 IL 122327. Defendant argued that he should receive the same sentencing considerations as a juvenile pursuant to *Miller* and the first district's decision in *People v. House*, 2019 IL App (1st) 110580-B. Defendant acknowledged that he was 23 years old at the time of the offenses but argued that he was a young adult, developmentally immature, had no prior criminal history, and could show mitigating evidence that would warrant the application of *Miller* factors.

¶ 19      Defendant's attached affidavit averred that the court had not been fully apprised of the nature of the abuse he suffered as a child. Defendant listed several examples of abuse that were not disclosed at the sentencing hearing as well as educational accomplishments which he achieved during his incarceration. Other information contained within the affidavit was included in his sentencing hearing. Specifically, that he lived with various relatives after the age of 14, his father and mother's boyfriend were drug users and alcoholics, he obtained a GED, he had never been married or had children, he had never been in a gang or abused drugs or alcohol, he had no prior criminal record, he had been honorably discharged from the military due to mental health reasons, and he decided to plead guilty to avoid hurting the family.

¶ 20      The court found, after its consideration of defendant's petition, exhibits, and case law, that *House* was inapplicable to defendant and dismissed defendant's petition. Defendant appeals.

¶ 21                                     II. ANALYSIS

¶ 22      Defendant argues the court erroneously dismissed his postconviction petition because it established the gist of a constitutional claim that his *de facto* life sentence violates the proportionate penalties clause of the Illinois Constitution by claiming that he was an emerging adult at the time of the murder and the court failed to consider his youth and its attendant characteristics at the sentencing hearing.

¶ 23      The Post-Conviction Hearing Act creates a procedure for imprisoned criminal defendants to collaterally challenge their convictions or sentences based on a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a)(1) (West 2020). "At the first stage, the court must accept as true and liberally construe all of the allegations in the petition unless contradicted by the record." *People v. Walker*, 2019 IL App (3d) 170374, ¶ 13. At the first stage of proceedings, a defendant need only state the gist of a

7

constitutional claim. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). This is a low threshold, requiring only a limited amount of detail. *Id.* However, the petition must " 'clearly set forth the respects in which petitioner's constitutional rights were violated.' " *People v. Jones*, 211 Ill. 2d 140, 144 (2004) (quoting 725 ILCS 5/122-2 (West 1998)). The circuit court may summarily dismiss the petition at the first stage of proceedings if it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition is frivolous or patently without merit when it possesses "no arguable basis either in law or in fact." *Id.* "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.*

¶ 24        In *Miller*, the United States Supreme Court found that a mandatory life sentence without parole for offenders under 18 years of age violated the eighth amendment. *Miller*, 567 U.S. at 465. Our supreme court found that *Miller* similarly applied to juveniles who received any life sentence, whether mandatory or at the discretion of the sentencing court. See *People v. Holman*, 2017 IL 120655, ¶ 40. Shortly thereafter, our supreme court extended *Miller*'s protections to juveniles who received a *de facto* life sentence of more than 40 years' imprisonment. See *Buffer*, 2019 IL 122327, ¶ 41.

¶ 25        For sentencing purposes, under the eighth amendment, the United States Supreme Court has drawn a clear and consistent line between juveniles and adults at 18 years of age. See *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *Graham v. Florida*, 560 U.S. 48, 74-75 (2010); *Miller*, 567 U.S. at 465. However, the proportionate penalties clause of the Illinois Constitution goes beyond the eighth amendment focusing more on the rehabilitation of a defendant. *People v. Clemons*, 2012 IL 107821, ¶ 40.

¶ 26    The proportionate penalties clause states that, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates this clause when it is so "cruel, degrading, or disproportionate to the offense that [it] shocks the moral sense of the community." *People v. Ligon*, 2016 IL 118023, ¶ 10. "As our society evolves, so too do [the] concepts of elemental decency and fairness which shape the "moral sense" of the community." *People v. Miller*, 202 Ill. 2d 328, 339 (2002). Defendant argues that court decisions in the last few years reflect an evolution in science and research on brain development and signals a shift in the moral sense of the community and supports the extension of *Miller* protections to emerging adults, like himself.

¶ 27    Defendant cites the first district's decision in *House*, 2019 IL App (1st) 110580-B, ¶¶ 55-66 in his initial brief as support for his contention. Since that time, our supreme court has rendered its opinion on the case, holding that a fully developed record was necessary for a court to make a determination of unconstitutionality on an as-applied to constitutional claim, remanding the cause for second-stage proceedings to allow defendant the opportunity to develop the record. *People v. House*, 2021 IL 125124, ¶¶ 27-29. Defendant argues that this holding does not find that a 19-year-old emerging adult was incapable of making such an as-applied constitutional violation claim.

¶ 28    However, there is a substantial difference between the instant case and *House*: the defendant in *House* was under the age of 21. Defendant fails to cite any authority where an offender who was 23 years old at the time of the offense received the special considerations set forth in *Miller*. Defendant cites *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 70-76, in support of the contention that courts have failed to draw a line at 21 years of age and *Miller*

9

protections can be extended beyond 21. The defendant in *Savage* was 21 years old at the time of the offense. He had been addicted to drugs since the age of 9 and was using drugs daily at the time of the offense, arguably rendering him under the functional age of 21. *Id.* ¶ 78. *Savage* does not support the proposition that *Miller* protections should be extended to defendants over the age of 21 and several cases have declined to extend such protections after the case was decided. See *People v. Robinson*, 2021 IL App (1st) 192289, ¶ 48; *People v. Williams*, 2021 IL App (1st) 190535, ¶¶ 21-36. In fact, numerous other courts have noted there is no support for extending the juvenile protections set forth in *Miller* to young adults over the age of 21. See, *e.g.*, *People v. Everett*, 2022 IL App (1st) 201169, ¶ 41; *People v. Suggs*, 2020 IL App (2d) 170632, ¶¶ 33-35; *People v. Humphrey*, 2020 IL App (1st) 172837, ¶¶ 33-34; *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 1. Accordingly, we find no support for the extension of the *Miller* considerations to the 23-year-old defendant.

¶ 29        Further, nothing about defendant's actions indicates that the abuse he suffered or mental illness rendered him functionally under the age of 21. Defendant demonstrated none of the hallmark features of youth—immaturity, impetuosity, a failure to appreciate risks and consequences, and an inability to meaningfully assist in his own defense. See *Suggs*, 2020 IL App (2d) 170632, ¶ 31. The record clearly reflects that defendant sold his personal effects and stockpiled survival items weeks in advance of the murder, including obtaining a prepaid cell phone. He loaded those items into his mother's vehicle on the morning of the murder, drove to Lance's house, and shot him 14 times. He removed Lance's vehicle from the garage and abandoned it in an empty parking lot before changing the license plate on his mother's vehicle and fleeing. Defendant evaded capture for five days. All these facts indicate a great amount of

planning and forethought. Nothing about defendant's actions was immature or impetuous. Accordingly, the court did not err in dismissing defendant's postconviction petition.

¶ 30                                III. CONCLUSION

¶ 31        The judgment of the circuit court of Will County is affirmed.

¶ 32        Affirmed.